### TURKS HEAD REALTY TRUST, Plaintiff,

v.

### SHEARSON LEHMAN HUTTON, INC., Defendant.

#### Civ.A. No. 89–0210 L.

United States District Court,
D. Rhode Island.

May 10, 1990.

---

Philip L. Eiker, Providence, R.I., for plaintiff.

Richard M. Borod, Edwards & Angell, Providence, R.I., for defendant.

## MEMORANDUM AND ORDER

LAGUEUX, District Judge.

This matter is before the Court for decision following a six day bench trial. This

case involves an office building in Providence known as the Turks Head Building. This building, constructed in the early part of this century, acquired its name from the presence of the sculptured head of a turbaned Turk protruding from the structure. The Turk gazes onto the intersection of Westminster and Weybosset Streets in the financial district of downtown Providence, one block removed from this courthouse.

Plaintiff, Turks Head Realty Trust, the present owner of the building, claims here that Shearson Lehman Hutton, Inc. (SLH), the successor lessee of a suite of rooms on the sixth floor, defaulted on its lease obligations, in October 1988, by vacating, abandoning or not occupying the leased premises for fourteen consecutive days. Plaintiff thus seeks damages as provided for under the lease agreement. Plaintiff also claims that defendant's breach of an oral agreement, whereby the parties purportedly agreed that defendant would extend its lease for three years in exchange for plaintiff's promise to renovate the sixth floor common areas, entitles plaintiff to recover the sums expended on the renovations prior to the breach. SLH counters that plaintiff wrongfully evicted defendant by changing the locks on the entrance to the SLH suite on October 19, 1988, and that such conduct constituted an eviction which now precludes plaintiff from recovering damages. Defendant has also counterclaimed seeking restitution of rent paid for the period following the lock out, and for rents inadvertently paid to plaintiff from January through April, 1989. After having heard all the evidence, the Court took the matter under advisement. The case is now in order for decision.

## FACTS

The parties to this lawsuit are interrelated as follows. Turks Head Corporation and E.F. Hutton and Company, Inc. (Hutton), a stock brokerage house, entered into a lease agreement on April 9, 1981. Hutton agreed to rent suite 600 in the Turks Head Building for a period of ten years. Thereafter, through a series of four amendments, the parties also agreed that Hutton would lease rooms 614–616 adjacent to suite 600. The Turks Head Corporation employed the Niles Management Company, Inc. (Niles) to manage the building. Niles employed C. Jerry Ragosa as an Executive Vice President (based in Boston) and Neil McCrystal as a property manager on site. McCrystal oversaw the day-to-day management of the Turks Head property and reported to Ragosa. In 1984, Turks Head Corporation sold its interest in and title to the Turks Head Building to the Turks Head Realty Trust (for purposes of this opinion Turks Head Corporation and Turks Head Realty Trust will be referred to interchangeably as "Turks Head"). Management of the building remained in the hands of Niles. Hutton's leasehold interest in the Turks Head property was assumed by Shearson Lehman Hutton, Inc. (SLH) following a merger in 1988.

During the trial, plaintiff introduced three leases which relate to tenancies within the Turks Head Building. Plaintiff first presented an executed copy of the lease between Turks Head and Hutton (Plaintiff's Ex. 1). Although the document appeared to be a photocopy, it was an executed copy, i.e., the parties had signed this copy directly. A notary public and witnesses also signed the copy directly. Defendant introduced an exact replica also signed directly by the parties (Defendant's Ex. A). In both copies, a portion of the Default and Remedies provision is blurred and totally illegible. Plaintiff also introduced two leases entered into between Turks Head and other Turks Head Building tenants (Plaintiff's Ex. 2 and 3). These leases were signed and notarized on the original, pre-printed lease forms.

Paragraph 16 of the pre-printed lease, discussing defaults and remedies under the lease, reads as follows:

16. Defaults and Remedies. If the Lessee shall (i) fail to pay any installment of base rent or other amount due and payable when due, whether or not such payment shall have been demanded; (ii) fail to perform or comply with any of the other conditions or agreements expressed or implied herein and fail to remedy such lack of compliance within 10

days after notice [from Lessor of such default; (iii) abandon, vacate or not occupy the premises for 14 consecutive days; (iv) liquidate or cease to exist, admit insolvency, seek relief under any law for the relief of debtors, make an assignment for the benefit of creditors or be the subject of a voluntary or involuntary petition in bankruptcy or receivership or in the event of any like occurrence which, in the sole judgment of the Lessor, evidences the serious financial insecurity of the Lessee or if the estate hereby created shall be levied upon or taken by execution or process of law, then and in any of such cases regardless] of any waiver of consent of any earlier event of default, the Lessor, at its option, may exercise any and all remedies available to the Lessor under law, all of such rights and remedies to be cumulative and not exclusive, including without limitation the following:

(1)(a) Lessor may terminate this lease by 5 days' notice to Lessee and this lease shall terminate on the date specified therein and Lessee shall quit and surrender the premises by said date and remain liable as set forth below;

(b) Lessor may enter upon the premises forthwith or at any subsequent time without notice or demand (which are hereby expressly waived by the Lessee) and thereby terminate the estate hereby created and expel the Lessee and those claiming under it and remove their effects without being guilty of any manner of trespass and the Lessee shall remain liable as set forth below and the Lessee further agrees that if Lessor shall cause Lessee's goods or effects to be removed from the premises pursuant to the terms hereof or of any court order, Lessor shall not be liable or responsible for any loss or damage to Lessee's goods or effects, and the Lessor's act of so removing such goods or effects shall be deemed to be the act of and for the account of Lessee.

(c) In the event of termination under (a) or (b) above, the Lessee shall pay to the Lessor as current liquidated damages (i) the base rent and other amounts payable hereunder up to the time of termination and (ii) thereafter until the expiration of the then current term hereof, whether or not the premises shall be relet and as and when due in accordance with the provisions hereof, the base rent and other sums payable hereunder if this lease had remained in effect less the net proceeds to the Lessor of any reletting of the premises, after deducting all expenses in connection with such reletting, including without limitation, all costs, fees and expenses of repossession, brokers, advertising, attorneys, courts, repairing, cleaning, repainting and remodelling the premises for reletting.

Paragraph 16 in the Turks Head/Hutton lease reads word for word like the lease provision above quoted except that the portion in between the brackets and underscored in the Turks Head/Hutton lease is illegible. Plaintiff argues that the illegible portion of the Turks Head/Hutton lease corresponds with the boilerplate language found in the pre-printed lease forms used by plaintiff and its other tenants and thus that language should be incorporated into the Turks Head/Hutton lease.

When entering into the lease for suite 600, the parties made several changes. The First Amendment, executed along with the lease, lists a series of modifications by numbers. These numbers correspond to numbers drawn into the body of the lease, representing the places where the new language belonged. One such addition relevant here is the limitation placed on the amount of recoverable damages. In section (1)(c) of paragraph 16, the parties limited the amount of damages payable upon default by providing for payment upon default of the base rent remaining for the term of the lease "less current Fair Market Rental Value of the demised premises for the remainder of the term."

In early 1988, Turks Head and Hutton began negotiations to renew the leases for rooms 614–616, those agreements having expired. At some point between June and July of 1988, the parties executed the Fifth Amendment to the basic lease. This amendment consolidated the lease agreements for suite 600 and rooms 614–616,

renewed the expired leases for rooms 614–616, and extended the expiration date for all the space until September 30, 1991. In the Fifth Amendment, Hutton agreed to renovate the rented space at its own expense. Plaintiff claims that it orally agreed that it would renovate the common hallway and the rest rooms on the sixth floor at its expense. Plaintiff now contends that since defendant did not fulfill its promise to rent the space until 1991, defendant should somehow reimburse plaintiff for the costs it expended to renovate the common areas.

After the Fifth Amendment was executed in 1988, Hutton merged with Shearson Lehman, thereafter becoming known as Shearson Lehman Hutton, Inc. (SLH). SLH assumed all of Hutton's obligations. On September 23, 1988, SLH moved its operations from the Turks Head Building to the Fleet Center. The move occurred after the close of the market at 4 p.m. on a Friday afternoon. Fearing that some disgruntled former employees might have retained their keys to the suite, Robin Russo, the manager of SLH's Providence office, ordered that the locks to the suite be changed. Following the lock change only three keys to the new lock existed. Robin Russo kept one. One key was given to the security guard who remained on the premises until October 4th. The security guard then gave that key to Paul McDermott, the operations manager for SLH. The third key was given to Neil McCrystal.

Following the move, one broker and three broker trainees worked in the Turks Head office until September 30th. SLH left office furniture, a good deal of electronic equipment, and files in the Turks Head suite. From time to time in late September and early October Russo and McDermott returned to the suite to retrieve necessary files. SLH paid its October rent and hired two receptionists and a security guard to work in the Turks Head suite until October 4th.

On October 18th, Mayflower Movers appeared at the Turks Head building to remove and transport some electronic equipment per the orders of SLH's corporate headquarters in New York. McCrystal's office turned them away without attempting to verify whether or not SLH had hired the movers. Later that day, the movers received clearance and McCrystal's office allowed them into the suite.

On the morning of October 19th, Robin Russo and Paul McDermott went to the Turks Head suite—Russo to check on the status of the electronic equipment and McDermott to retrieve files. They found that their key would not unlock the door. The day before, after McCrystal told Ragosa in Boston that SLH had sent a moving company to the Turks Head suite, Ragosa ordered McCrystal to have the locks changed. McCrystal ordered his subordinate, Joseph Mirra, the facilities manager, to change the locks. That was accomplished early on the morning of October 19th. Russo and McDermott did not gain entry to the suite for several days after October 19th. Eventually, plaintiff gave SLH permission to enter the premises to retrieve files and much later to remove furniture purchased by Advest, Inc.

Acting by order of Ragosa, McCrystal sent SLH a letter on October 20th. The letter did not purport to terminate the lease. Rather, it merely advised SLH that it had "breached its Lease ... by vacating." The letter also indicated that plaintiff would hold SLH liable for the rent for the remainder of the term of the lease. A second letter from C. Jerry Ragosa notified SLH that Turks Head considered SLH in default because it had abandoned the premises for over fourteen days. The letter specified that the lease would terminate five days from "this" date. The letter, dated October 26, 1988, was not postmarked until November 4, 1988, and not received by SLH until November 8, 1988.

Throughout September and October of 1988, SLH representatives negotiated with Advest, Inc., another brokerage firm, in an attempt to sublease the Turks Head suite to Advest. Turks Head also recruited Advest as a new tenant for either the sixth or ninth floor space. In the end Advest declined all the proposals and elected to go elsewhere, but it purchased SLH's remain-

ing office furniture at suite 600 and moved it out in December 1988.

Following the close of all the evidence, this Court took this matter under advisement to decide whether plaintiff is entitled to recover damages for breach of the lease and/or reimbursement for the costs of renovations, and whether defendant should recover the rents it paid following the October 19th lock out pursuant to its counterclaim.

## DISCUSSION

### A. Plaintiff's claims

■ A key issue in this case is whether this Court should substitute the "vacate, abandon or not occupy" language found in paragraph 16 of the pre-printed lease forms for the illegible portion of the Turks Head/Hutton lease. This is not a best evidence rule question. The issue of the admissibility of secondary evidence need arise only when an original record has been lost or destroyed. *See Schiffman v. Narragansett Hotel Inc.*, 86 R.I. 258, 263, 134 A.2d 153, 155–56 (1957). Here, the parties signed, and initialed the photostatic copies directly and had them notarized and witnessed. Therefore, the "copies" in evidence are the original leases.

■ Under Rhode Island law and the general law of contracts, this Court cannot substitute the "vacate, abandon, and not occupy" language in the pre-printed form for the illegible portion of the Turks Head/Hutton lease. The Court must construe the parties' intentions from the express language found in the agreement. *Harbor Marine Corp. v. Briehler*, 459 A.2d 489, 491 (R.I.1983); 1 *Corbin on Contracts* § 95 (1963). "[I]ntent must be ascertained only from what is actually expressed . . . without resort to conjecture or speculation." *Smith v. Powers*, 83 R.I. 415, 421, 117 A.2d 844, 847 (1955) (discussing testamentary construction); *see generally* Calamari & Perillo, *The Law of Contracts* § 9–31 (2d ed. 1977). Turks Head did not introduce the testimony of anyone involved in the lease negotiations or execution who could attest to the use of a pre-printed form identical to those admitted into evidence in this case. Although a secretary from Turks Head indicated that when negotiating lease agreements Turks Head generally started with a pre-printed lease form identical to those in evidence, she admitted that she had no knowledge of the procedure actually followed in preparing this particular lease in question. Having no evidence from which to deduce the parties' intent, this Court cannot speculate as to the process followed or the language desired. Therefore, this Court will not substitute the pre-printed language for the void in the executed lease. Consequently, there was no operative clause in this lease which allowed the lessor to terminate if the lessee abandoned, vacated or failed to occupy the leased premises for 14 consecutive days.

■ Even if this Court substituted the boilerplate language for the illegible wording in the lease, plaintiff has failed to establish that defendant abandoned, vacated or left the premises un-occupied for the 14 day period. Courts have recognized abandonments only when lessees have vacated the premises and demonstrated a clear intent not to be bound under the lease. *tenBraak v. Waffle Shops, Inc.*, 542 F.2d 919, 924 n. 5 (4th Cir.1976); *Simpson v. Lee*, 499 A.2d 889, 894 (D.C.1985); *Italian Fisherman, Inc. v. Middlemas*, 313 Md. 156, 545 A.2d 1, 6 (1988). Similarly, this Court accepts the ordinary meaning of the terms "vacate" and "not occupy", both suggesting the absence of any occupants or personalty associated with occupancy. *See Monmouth Real Estate Invest. Trust v. Manville Foodland, Inc.*, 196 N.J.Super. 262, 482 A.2d 186, 189 (1984), *cert. denied*, 99 N.J. 234, 491 A.2d 722 (1985). SLH's maintenance of property on the premises, payment of rent, and possession of keys provide outward manifestations of its continued dominion over the property (until October 19) sufficient to overcome Turks Head's allegations that SLH vacated, abandoned or no longer occupied the suite immediately following its move. *See, e.g., Associated Stations, Inc. v. Cedars Realty & Dev. Corp.*, 454 F.2d 184, 187 (4th Cir. 1972); *United States v. Olsen*, 245 F.Supp.

641, 645 (D.Mont.1965); *cf. Italian Fisherman, supra,* 313 Md. 156, 545 A.2d at 6.

The evidence clearly demonstrates that even after SLH moved to the Fleet Center, it considered itself bound by the lease. Although it had removed most of its operations to the Fleet Center on September 23, SLH paid its rent for the month of October on the first of the month. SLH representatives testified that they felt bound by the lease and sought to have Turks Head agree to substitute another tenant for SLH. SLH made concerted efforts before October 18, 1988 (the lock out date) to sublease the space, further demonstrating its understanding and acceptance of its lease obligations. Therefore, under any view of this case, it is clear that SLH had not abandoned nor vacated the Turks Head suite after it moved the majority of its operations from the suite in September, 1988.

■ Even if plaintiff had established that SLH defaulted by vacating the premises, its failure to follow the proper eviction procedures would have precluded its claim for the remaining rent due on the lease. *See Camalier & Buckley–Madison, Inc. v. Madison Hotel, Inc.,* 513 F.2d 407, 415 (D.C.Cir.1975) (until termination procedures followed, lease and estate thereunder unaffected). Courts construe notice provisions very literally. *See Tatewosian v. McLellan,* 78 R.I. 207, 209–10, 80 A.2d 879, 880 (1951) (four day notice to quit insufficient to terminate relationship where lease requires five days notice). The lease required Turks Head to give SLH a five day notice of termination with the exact date of termination specified thereon. Neil McCrystal's letter fell far short of these requirements. It discussed an alleged breach of the lease but failed to indicate that Turks Head considered the lease terminated. C. Jerry Ragosa's letter, although qualifying as a notice of termination, also failed to give notice sufficient to terminate the lease as of October 31, 1988, as it purported to do. The letter, dated October 26, 1988, was not postmarked until November 4 and not received by SLH until November 8. Because of plaintiff's failure to give sufficient notice, the termination attempt was ineffective.

In any event, plaintiff wrongfully evicted defendant on October 19, 1988, when it had the locks on the SLH suite changed before any termination attempt was made. Under Rhode Island law any intentional act or conduct by the landlord or by one acting under the authority of the landlord which deprives a lessee of his or her rightful possession constitutes an eviction. *See King v. King–McLeod–Fraser, Inc.,* 98 R.I. 226, 231, 200 A.2d 705, 707–08 (1964); *Miller v. Maguire,* 18 R.I. 770, 772, 30 A. 966 (1895). Defendant paid rent through October, thereby continuing its right to use and enjoy the property. *See id.* Plaintiff interfered with defendant's rights in the property when it changed the locks and deprived defendant's entry to the suite on October 19. It is clear that plaintiff took control of the leased property on that date and SLH could only gain access by permission of plaintiff thereafter. Plaintiff's conduct, therefore, falls squarely within the definition of eviction.

The statutory prohibition of self-help as a remedy for non-payment of rent in commercial leases also supports the proposition that plaintiff wrongfully evicted SLH in this case. The Rhode Island General Laws provide:

> [t]he right of a landlord or a reversioner to utilize 'self-help', so called, whether pursuant to the common law or pursuant to any agreement in writing or by parol, to reenter and repossess him or herself of land, buildings or parts of buildings leased covered by this chapter upon non-payment of rent is prohibited.

R.I.Gen.Laws § 34–18.1–15 (Supplement 1989). The Rhode Island courts have broadly construed an almost identical statute relating to residential leases, finding that the statute, although specifically addressed to evictions for the non-payment of rent, pertained to *all* self-help evictions. *See Coolbeth v. Berberian,* 116 R.I. 188, 192, 354 A.2d 120, 123 (1976) (emphasis included) (discussing prior self-help prohibition, *See* R.I.Gen.Laws § 34–18–9 (1969)). Applying the same broad construction to

the commercial lease statute, plaintiff's conduct violated the self-help provisions relating to commercial leases.

Plaintiff's contention that it changed the locks on the SLH suite for security reasons is unpersuasive. McCrystal knew that SLH had changed the locks when it moved. He also knew that only three keys existed. Plaintiff's practice of checking the premises continuously throughout the day provided ample security. Ragosa's termination notice confirms that plaintiff was also not attempting to terminate the estate pursuant to paragraph 16 section (1)(b) when they changed the locks. Had plaintiff intended to terminate the lease through repossession, it would not have felt obliged to send a default notice. Plaintiff obviously changed the locks to gain complete dominion and control of the premises. Under any view of the evidence, plaintiff intended to lock SLH out and, thus, intended to evict SLH from the Turks Head suite as of October 19, 1988.

■ Since an eviction operates to either annul or suspend the rent obligations, *King, supra,* 98 R.I. at 230–31, 200 A.2d at 707, plaintiff has no right under the lease or by law to claim the remaining rents due for the term of the lease as damages. Even if plaintiff were able to recover rents under the lease as damages, the agreement limited plaintiff's damages to the amount of rent due for the remainder of the rental period less the current fair market rental value of the premises for the same period. The Court finds from testimony of defendant's real estate expert that the rental value at the time of the alleged breach of lease was higher than the amount owing as rent over the remainder of the lease. Thus, plaintiff suffered no damages.

Under the lease, however, plaintiff may recover the 1988 escalation fee owed by defendant for the period defendant remained in possession of the premises. The escalation fee accounted for tax increases and became payable in March of every year for the preceding year. The amount owed by the defendant in March, 1989 for 1988 must be prorated to mid-October 1988, when plaintiff evicted defendant. Testimo-

ny established that the total escalation fee for 1988 amounted to $29,300.00. Although plaintiff's witness calculated the deduction from October 26th, the date that Ragosa sent the termination letter, the deduction should be calculated from October 19th, the day of the lock out. Plaintiff is entitled to $23,360.02 which amounts to the difference between the $29,300.00 escalation fee and the prorated daily amount of $80.27 multiplied by the seventy four days remaining in the year following the lock out. $(29,300.00 - (80.27 \times 74) = 23,360.02)$.

■ This Court denies plaintiff's additional claim for the sums it expended to renovate the sixth floor common areas and rest rooms, because there simply was no contract between Turks Head and Hutton regarding that matter. Plaintiff asserts that it orally contracted to renovate the common areas in return for defendant's promise to extend its lease. That clearly is not so. The evidence in this case establishes that, separate and apart from the Fifth Amendment agreement, plaintiff *voluntarily* agreed to refurbish those areas to beautify the building. In addition, plaintiff's own witnesses testified that the renovations to the sixth floor rest rooms were completed in late 1987 or early 1988, before the Fifth Amendment was even under negotiation. It is also clear that the common hallway renovations began in May or June of 1988. Defendant's signed copy of the Fifth Amendment, however, bears the date July 18, 1988, indicating that the agreement was executed after most of the renovations were complete. Further, the Fifth Amendment makes no mention of the renovations to the common area or to the rest rooms. It does, however, refer to renovations to the interior of the suite to be completed by Hutton at its own expense. Clearly Hutton did not bargain for plaintiff to do renovation work in exchange for and as consideration for the execution of the Fifth Amendment. In any event, there was no breach by Hutton—it signed the Fifth Amendment extending the term of the lease to 1991. It is plaintiff who com-

mitted a breach of the lease by evicting defendant in October, 1988.

### B. Defendant's counterclaim

 Defendant filed counterclaims requesting recovery of rent paid in error from January through April of 1989, plus the amount of rent prorated from October 19th through October 31st, 1988. Defendant's counterclaim also requests punitive damages. Since SLH's obligations to pay rent ended with the lock out and wrongful eviction, it is entitled to both the four monthly rental payments of $7174.67 inadvertently paid to Turks Head in 1989 and to the pro rata share of the October, 1988 rent. *See Evangelista v. Antonio De Cubellis, Inc.*, 79 R.I. 142, 147, 85 A.2d 69, 71 (1951) (money paid on rescinded contract recoverable). Defendant is entitled to $28,-698.68 for the four months of rent paid in 1989 and to $3,008.72, or $\frac{13}{31}$sts of the $7174.67 paid in October, 1988. Defendant's request for punitive damages, however, must be denied. Under Rhode Island law, punitive damages require evidence of knowing, willful and malicious conduct. Reckless or negligent conduct does not suffice. *See Regan v. Cherry Corp.*, 706 F.Supp. 145, 152–53 (D.R.I.1989). "[A] court may only award punitive damages for *intentional* conduct that is *malicious.*" *Id.* at 153 (emphasis included). Although the lock out action here was willful, it was not ruled by malice. The Niles people responsible for the lock out obviously thought that it was the best way to protect plaintiff's legal rights, but it turned out to be an enormous legal blunder. Defendant's request for punitive damages is denied.

### CONCLUSION

For the reasons stated above, plaintiff is entitled to recover $23,360.02 plus pre-judgment interest of 12% per annum calculated from April 1, 1989, to the date of the judgment. The Clerk will enter judgment for plaintiff in that total amount against defendant on the complaint.

Defendant's recovery of the prorated October, 1988 rent amounts to $3,008.72 plus 12% per annum interest to be calculated from October 19, 1988 to the date of the judgment. Defendant is also entitled to recover the $7,174.67 paid as January, 1989 rent plus 12% per annum interest calculated from January 1, 1989 to the date of judgment. The same is true for the February, March and April, 1989 rent payments. The 12% per annum interest on those $7174.67 payments will be calculated from February 1, 1989, March 1, 1989, and April 1, 1989, respectively to the date of the judgment. The Clerk will enter judgment for defendant against plaintiff on the counterclaim in the above total amount.

*It is so Ordered.*