196 N.J. Super. 262 (1984)
482 A.2d 186
MONMOUTH REAL ESTATE INVESTMENT TRUST, D & E REALTY COMPANY AND EDWARD M. NELSON, JR., PLAINTIFFS-APPELLANTS,
v.
MANVILLE FOODLAND, INC., FOODARAMA SUPERMARKETS, INC., EASTON & HOUSTON CORP., MAYFAIR SUPERMARKETS, INC., NEW LINDEN PRICE RITE, INC., AND STANLEY KAUFELT, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 12, 1984.
Decided October 4, 1984.
*265 Before Judges MATTHEWS, FURMAN and COHEN.
Eugene W. Landy argued the cause for appellants (Landy & Spector, attorneys).
Irwin P. Burzynski argued the cause for respondents Manville Foodland, Inc., Foodarama Supermarkets, Inc., and New Linden Price Rite, Inc. (Hellring, Lindeman, Goldstein & Siegal, attorneys; Robert S. Raymar, on the brief; Bernard Hellring, Robert S. Raymar and Irwin P. Burzynski, of counsel).
Paul F. Clausen argued the cause for respondents Mayfair Supermarkets, Inc., Easton & Houston Corp., and Stanley Kaufelt (Greenbaum, Rowe, Smith, Ravin, Davis & Bergstein, attorneys; Victor A. Deutch, of counsel).
The opinion of the court was delivered by FURMAN, J.A.D.
Plaintiffs appeal from judgment of dismissal on motion, R. 4:37-2(b), at the close of their proofs in a jury trial on the issue of liability only. Defendants cross-appeal from the denial of costs other than taxed costs.
This litigation arises out of a lease assignment followed by a sublease of a 33,000 square foot building in a shopping center on Route 527 in Franklin Township outside the City of New Brunswick. The building was occupied by a supermarket between *266 1967 and 1981 and is flanked by a separate 10,000 square foot building, which is partitioned for eight satellite stores.
Plaintiffs are Monmouth Real Estate Investment and D & E Realty Company (Monmouth), owners of the shopping center, and Edward M. Nelson, Jr., a customer of the former supermarket. Defendants are Foodarama Supermarkets, Inc. and its wholly owned subsidiaries Manville Foodland, Inc. and New Linden Price Rite, Inc. (Foodarama), who leased the building from Monmouth and operated the supermarket; and Mayfair Supermarkets, Inc., its subsidiary Easton & Houston Corp. (Mayfair), and its chief executive officer Stanley Kaufelt. Foodarama assigned the lease to Mayfair for $140,000 in March 1981. Mayfair in turn subleased the building at the same rent to Unclaimed Salvage & Freight, a corporation, in July 1981. Unclaimed Salvage & Freight, which is not a party to this litigation, has maintained a store for the sale of unclaimed goods.
Foodarama's supermarket business declined by 20 percent or more upon the construction by the State of a concrete median divider on Route 527 in the fall of 1979. Pursuant to the lease Foodarama had paid Monmouth overage rentals totaling slightly over $40,000 based upon a percentage of gross receipts in excess of eight million dollars per year during the six preceding years. Gross receipts fell below eight million dollars annually thereafter. Meanwhile approvals were granted by the State and the municipality in January and February 1981 for design and construction of a jughandle to provide access to and from the shopping center across Route 527. The jughandle was completed and open for traffic in the late fall of that year.
Mayfair owns a supermarket about half a mile from the former Foodarama supermarket, on the opposite side of Route 527, and in competition with it for several years preceding 1981. Aware of the precipitous fall-off in Foodarama's business and of Foodarama's interest in assigning its lease, Mayfair negotiated with Foodarama for a sublease to it and with a firm referred *267 to in the record as Drug Fair for a sublease, in turn, from it of half the building. Foodarama ceased retail supermarket operation on March 7, 1981 and assigned its lease to Mayfair on March 17, 1981. Mayfair's negotiations with Drug Fair broke off unsuccessfully. The former supermarket premises were closed for retail business from March 7 until about July 15, 1981, when Unclaimed Salvage & Freight opened its store. Foodarama employees were present in the building on a regular basis detaching and removing fixtures and equipment from March until late June 1981.
Monmouth's complaint sought a declaration of rights and obligations under the lease; compensatory damages for breach of the lease against both Foodarama as lessee and Mayfair as assignee of the lease; and compensatory and punitive damages for the intentional tort of tortious interference with prospective economic advantage, primarily against Mayfair. Nelson as co-plaintiff sought an injunction, N.J.S.A. 56:9-10(b), and treble damages, N.J.S.A. 56:9-12, against both Foodarama and Mayfair for violation of the New Jersey Antitrust Act, N.J.S.A. 56:9-1 et seq., specifically N.J.S.A. 56:9-3 and 56:9-4(a). A prior antitrust action brought by Monmouth against Foodarama and Mayfair was dismissed in the United States District Court for lack of standing in October 1981. In the litigation before us, a trial judge dismissed the State antitrust claim brought by Monmouth, also for lack of standing. That pretrial ruling is not challenged.
The standard for appellate review of the dismissal of the various causes of action is whether the evidence, together with the legitimate and favorable inferences therefrom, could sustain a judgment in any of the plaintiffs' favor, Dolson v. Anastasia, 55 N.J. 2, 5 (1969). By applying that standard we affirm.
Monmouth claims three breaches of its lease to Foodarama: non-occupancy of the building for over 90 days during Foodarama's detachment and removal of fixtures and equipment; *268 use of the building by Unclaimed Salvage & Freight other than for a supermarket; and bad faith and unfair dealing contrary to what it asserts to be an implied covenant. By a plain reading of the lease all three claims are untenable. No covenant can be implied in the lease contrary to its express provisions. Nor does Monmouth argue on appeal that a fact issue as to the intent and understanding of the parties remains unresolved. The lease permits assignment "freely" and without the landlord's approval.
Default is provided for under the lease "if the Tenant leaves the leased premises unoccupied for a continuous period of ninety days or more during the term of the lease." Monmouth would construe "unoccupied" as "closed for business" and impose a default based upon the approximately 90-day period of Foodarama's clean-up and removal of fixtures and equipment after its supermarket shutdown. But that provision of the lease must be construed, contrary to Monmouth's construction, in pari materia with Paragraph 15, which authorizes the tenant "at any time during the term of this lease" to remove its property, including fixtures and equipment installed by it on the leased premises. We construe "unoccupied" as Judge Selikoff did below, in accordance with the accepted meaning in the law of its antonym "occupied," that is, in actual possession and use, irrespective whether in retail business use or not.
Under the lease permissible use of the leased premises is restricted to "the operation of a supermarket and drug store and any and all other lawful purposes." Another provision authorizes the landlord to construct satellite stores in the same shopping center but not to permit use of any of them as a supermarket "or any other establishment selling food for off-premises consumption." In the light of the lease restriction against competition with a supermarket and in the light of the lease provision for overage rentals based upon gross receipts from sales exceeding eight million dollars, Monmouth would *269 construe permissible use of the premises as limited to supermarket use. It argues that "any and all other lawful purposes" in the permissible use provision of the lease means "any and all other lawful purpose," incidental to and combined with supermarket use or supermarket and drug store use and that uses not incidental to and combined with supermarket use are barred.
Like Judge Selikoff below, we read no such limitation into the lease provision governing permissible uses. Rather, we construe it as permitting any other lawful use separate from and in lieu of supermarket use, specifically use as a retail store by Unclaimed Salvage & Freight.
In rejecting Monmouth's construction of "any and all other lawful purposes," we apply the rule of construction of leases set forth in Carteret Properties v. Variety Donuts, Inc., 49 N.J. 116, 127 (1967):
... [W]here a landlord claims that a limitation on the use of demised premises is imposed by a lease, all doubts with respect thereto arising from the language employed ordinarily are resolved in favor of that construction which least restricts the use.
Ingannamorte v. Kings Super Markets, Inc., 55 N.J. 223 (1970) is clearly distinguishable and does not compel a contrary result because of the restriction in the lease involved there that the leased store was "to be used and occupied only for a supermarket."
Monmouth's remaining cause of action sounds in tort for willful, unjustified and unreasonable interference with its lease and with its prospective economic advantage. In view of our affirmance of the holding below that the proofs failed to establish a prima facie breach of the lease by any defendant, we need deal only with Monmouth's claim of tortious interference with prospective economic advantage. The jury trial was limited to the issue of liability. Nevertheless, there was sufficient evidence in the record, in our view, to support an inference that Mayfair intended to terminate retail supermarket operation at the leased premises and that such termination, even if another retail store use ensued, would deprive Monmouth of *270 overage rentals under the lease and of enhanced rental value of the satellite stores, economic advantages to be anticipated from a continuing supermarket operation, upon construction of a jughandle on Route 527 to facilitate access to the shopping center.
Our further determination, accordingly, must be whether on Monmouth's proofs, in the light most favorable to them, a jury could have found liability for a tortious interference against Mayfair, as tortious interference with prospective economic advantage is defined in the case law.
According to Louis Schlesinger Co. v. Rice, 4 N.J. 169, 179-181 (1950), an element of a tortious interference with a contractual or business relationship is malice, that is, the "intentional doing of a wrongful act without justification or excuse." The opinion of Justice Heher recognizes that malice may be inferred from the absence of just cause or excuse, that competition may be justification and that business loss as a "mere incident" of competition is damnum absque injuria. In Glasofer Motors v. Osterlund, Inc., 180 N.J. Super. 6, 26 (App. Div. 1981), we held that a tortious interference must be "unreasonable." See also Harris v. Perl, 41 N.J. 455, 461 (1964); Louis Kamm, Inc. v. Flink, 113 N.J.L. 582, 588-590 (E. & A. 1934); O'Connor v. Harms, 111 N.J. Super. 22, 26 (App.Div. 1970), certif. den. 57 N.J. 137 (1970).
Judge Selikoff concluded below that Monmouth's proofs would not support a finding of malice by Mayfair. We agree that no evidence of a deliberate spiteful intent directed towards Monmouth was before the jury. Nor does Monmouth contend to the contrary on appeal. Rather, Monmouth contends that Mayfair's purchase of the assignment of the Foodarama lease was unreasonable and unjustifiable and, thus, through an inference of malice actionable as a tortious interference.
Under the evidence in the light most favorable to Monmouth, the jury as fact finder, by rejecting Mayfair's claim of a real estate investment, might have inferred that Mayfair acquired the Foodarama leasehold for the sole, or at least predominant, *271 purpose of reducing competition with its own supermarket by eliminating a competitor half a mile away. Judge Selikoff categorized the acquisition as a "legitimate business practice." Monmouth cites no authority, and our research reveals none, that the purchase of a competitor's business premises in order to shut down its business and thereby to reduce competition is actionable either as a tortious interference with prospective business advantage or as an antitrust law violation, unless amounting to an unreasonable restraint of trade with a significant tendency to reduce competition. No market data were introduced at trial; no prima facie showing of an unreasonable restraint of trade was before the jury.
Only unreasonable restraints of trade and monopolies within relevant geographic and product markets are antitrust law violations. See Pomanowski v. Monmouth Cty. Bd., 89 N.J. 306, 315 (1982); State v. Lawn King, Inc., 84 N.J. 179, 194 (1980); Glasofer Motors v. Osterlund Inc., supra 180 N.J. Super. at 26; Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1050 (9 Cir.1983), cert. den. ___ U.S. ___, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983); N.J.S.A. 56:9-3 and 56:9-4(a). As the Supreme Court stated in Pomanowski:
As first framed in Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), the "rule of reason" requires the court to weigh all the circumstances of a given case to determine whether the disputed practice constitutes an "unreasonable restraint on competition." State v. Lawn King, Inc., supra, 84 N.J. at 194. See also Continental T.V., Inc. v. G.T.E. Sylvania, Inc., supra, 433 U.S. [36] at 49, 97 S.Ct. [2549] at 2557, 53 L.Ed.2d [568] at 580 [(1977)]. The court must subject the challenged restraint's impact on competitive conditions to probing examination. United States v. Realty Multi-List, Inc., 629 F.2d 1351, 1362 (5th Cir.1980). See also National Society of Professional Engineers v. United States, 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637, 648 (1978). [89 N.J. at 315]
We hold that Mayfair's purchase of an assignment of the Foodarama lease, even assuming a predominant purpose to reduce competition by eliminating a competitor, was not per se actionable and that Monmouth's proofs fell short of a prima facie cause of action for malicious, unreasonable or unjustifiable interference with the prospective benefits of its leasehold interest.
*272 The surviving count for antitrust law violations after dismissal of Monmouth's is plaintiff Nelson's as a customer of the former Foodarama supermarket. His sole allegation was inconvenience to him. At the time of trial he shopped at a supermarket two and a half miles away approximately twice a month (without explanation why he did not shop at the Mayfair Supermarket only half a mile from the former Foodarama supermarket).
Judge Selikoff questioned Nelson's standing but went on to rule that his proofs on his antitrust claim for injunctive relief and treble damages were insufficient to withstand defendants' motions for dismissal. We agree with that substantive holding; we would also dismiss Nelson's antitrust cause of action for lack of standing. The New Jersey Antitrust Act in N.J.S.A. 56:9-10(b) establishes an injunctive remedy to any person threatened with loss or damage to "property or business." Palpably, Nelson suffered or was threatened with no loss or damage to his property or business. He alleged no out-of-pocket loss other than de minimis additional travel expenses by automobile.
Nelson's evidential showing of an antitrust law violation, without relevant market data, would not have sustained a determination in his favor of an unreasonable restraint of trade with a significant tendency to reduce competition. The proofs failed to meet the rule of reason test recognized and applied in Northrop, Pomanowski and other authorities cited supra. Further, Nelson failed to specify what injunctive relief he sought and failed to join as a party Unclaimed Salvage & Freight, the sublessee in possession of the premises.
Other issues raised by plaintiffs may be dealt with briefly. Because of our affirmance on other grounds, we need not and do not pass upon the issue of waiver against plaintiff Monmouth, which was decided in favor of defendants below, specifically whether the clause in the lease providing that acceptance of rent would not effect or constitute a waiver should be denied *273 enforcement under Carteret Properties v. Variety Donuts, Inc., supra 49 N.J. at 129.
Plaintiffs urge that evaluations of the issues by another trial judge in denying defendants' pretrial motion for summary judgment should be "the law of the case." In our view pronouncements prior to the introduction of any evidence were not binding on the trial judge in the differing procedural context of the motion for dismissal at the close of plaintiffs' proofs.
One other issue raised by plaintiffs, although not as a separate point, is clearly without merit: that reversible error was committed in the exclusion of various documents from evidence, including long outdated and irrelevant market surveys. We sustain Judge Selikoff's exercise of discretion under Evid.R. 4.
We reject also defendants' cross-appeals from the discretionary denial of costs other than taxed costs. In our view Judge Selikoff did not abuse his discretion in failing to award costs other than taxed costs to defendants. See Fortugno Realty Co. v. Schiavone-Bonomo Corp., 39 N.J. 382, 396 (1963); Willis v. Dyer, 163 N.J. Super. 152, 165 (App.Div. 1978).
We affirm on the appeal and cross-appeals.