2004 VT 47

# Downtown Barre Development v. C & S Wholesale Grocers, Inc., GU Markets, LLC, GU Markets of Barre, LLC, and Maxi Drug, Inc., Intervenor

[857 A.2d 263]

No. 03-209

Present: Amestoy, C.J., Dooley, Johnson and Skoglund, JJ., and Allen, C.J. (Ret.), Specially Assigned

Opinion Filed May 28, 2004
Motion for Reargument Denied July 28, 2004

*Andrea L. Gallitano* of *Otterman and Allen, P.C.*, Barre, for Plaintiff-Appellee/Cross-Appellant Downtown Barre Development.

*Leighton C. Detora* of *Valsangiacomo, Detora & McQuesten, P.C.*, Barre, for Appellees/Cross-Defendants-Appellants C & S, et al.

*Robert S. DiPalma* of *Paul, Frank & Collins, P.C.*, Burlington, for Intervenor-Appellant Maxi Drug, Inc.

¶ 1. **Skoglund, J.** The principal issue in this case is whether the parties' commercial lease allows the current shopping plaza tenant to divide the subject premises and create two smaller retail establishments out of the space where the former tenant had operated a supermarket. The owner of the shopping plaza, plaintiff Downtown Barre Development (DBD), filed suit in an attempt to stop intervenor Maxi Drug, Inc. from purchasing the former tenant's rights under the lease and commencing renovation work on its plan to divide the premises, set up a Brooks Pharmacy in part of the space where the former supermarket had stood, and sublet the remaining space to another retailer. Based on its interpretation of the parties' lease, the superior court enjoined Maxi Drug and the former tenant from

dividing the space and using it for any purpose other than as a supermarket or comparable store. The court also assessed damages against Maxi Drug and the former tenant for violating the lease's implied covenant of good faith and fair dealing. Maxi Drug, the former tenant, and DBD each appeal the court's decision. We conclude that the lease does not preclude Maxi Drug from dividing the commercial space, establishing a Brooks Pharmacy in part of the space, and subletting the remaining space to another retail business. Accordingly, we reverse the superior court's ruling and remand the matter for entry of judgment in favor of Maxi Drug with respect to DBD's complaint.

¶ 2. DBD is a limited partnership formed in 1973 for the purpose of developing and owning the shopping plaza that is at the center of this dispute. DBD bought land, tore down old buildings, and began construction of the shopping center, which included a 26,000 square-foot store connected to smaller stores totaling about 16,000 square feet. Before commencing construction, DBD lined up the commercial leases, including one with Grand Union, Inc. for the large store. The Grand Union lease, which was signed on February 15, 1973, provided for a fixed-base rent, plus a percentage rent that was triggered at $10 million dollars in gross sales and capped at $14 million dollars in sales. The lease was written for twenty years, with four five-year renewal periods. A later amendment to the lease added two more five-year renewal periods. The leases for the minor tenants provided for much shorter terms and regular consumer-price-index increases to the fixed rents.

¶ 3. Grand Union experienced significant financial difficulty during the 1990s, culminating in a bankruptcy liquidation proceeding in 2000. DBD chose not to participate in that proceeding, in which C & S Wholesalers, Inc. purchased many of Grand Union's assets and created Grand Union Markets LLC (GUM) to hold them. C & S then organized a separate limited liability corporation for each of the individual former Grand Union properties. The corporation C & S established to operate the store at the center of this dispute was called Grand Union Markets of Barre LLC (GUMB). In December 2000, the bankruptcy court approved the transfer of the Grand Union lease to GUMB. Throughout this period, the supermarket remained open for business.

¶ 4. Between the summer of 2001 and the summer of 2002, Maxi Drug separately contacted first DBD, and then C & S, about its interest in either purchasing the supermarket plaza or taking over the Grand Union lease. On at least two different occasions, DBD declined

Maxi Drug's offer to purchase the shopping plaza. DBD expressed some interest in Maxi Drug's proposal to divide the Grand Union space and operate a Brooks Pharmacy in part of it, but DBD took the position that the existing lease could not be assigned, and that a new lease would have to be negotiated. Ensuing negotiations between Maxi Drug and DBD broke down, but in August 2002 GUMB agreed to assign the Grand Union lease to Maxi Drug for $475,000, with a closing set for October 20, 2002. Maxi Drug then resumed discussions with DBD concerning the terms of a replacement lease. DBD reaffirmed its position that the existing lease could not be assigned and rejected Maxi Drug's proposal to divide the property. On October 18, the Grand Union supermarket ceased operations.

¶ 5. On October 25, 2002, DBD filed a complaint against C & S, GUM, and GUMB, seeking declaratory and injunctive relief, as well as compensatory and punitive damages. Four days later, on October 29, the closing was held on the assignment of the lease from GUMB to Maxi Drug. That same day, a contractor acting on behalf of Maxi Drug obtained a building permit in DBD's name to commence renovation work on the Grand Union property. Upon learning of the permit and proposed renovation, DBD sought a temporary restraining order. Apparently, that request was denied on an ex parte basis because there was no indication that the work would begin before the parties had an opportunity for notice and a hearing. At Maxi Drug's direction, renovation work began on November 6, 2002. The inside of the supermarket was gutted. The contractor intended to refit the space for two separate stores with separate electrical and heating systems, but the superior court temporarily halted the work on November 18.

¶ 6. On December 18, 2002, following two days of hearings, the superior court granted DBD's request for a preliminary injunction. A final merits hearing was held over two days in February 2003, and the court issued its judgment on March 18, 2003. The court concluded that the parties' lease entitled DBD to prohibit its tenant from dividing the Grand Union space and using it for purposes other than as a supermarket or other comparable anchor store. While acknowledging that specific provisions of the lease unambiguously permitted any lawful use of the space, the court determined that the lease as a whole reasonably and necessarily implied a condition that the premises be operated as a single unified supermarket or comparable store. The court also concluded that Maxi Drug and GUMB had violated the covenant of good faith and fair dealing implied in the lease by going

ahead with renovation work without disclosing to DBD the extent of the work, even though they knew DBD was opposed to dividing the space. The court assessed damages of only $1000 each against GUMB and Maxi Drug for this violation, however, stating that most of the litigation costs would have been incurred even absent the violation. The court granted injunctive relief to DBD, but assessed no damages other than the $2000, concluding that DBD's request for damages was premature because Maxi Drug still had the opportunity to restore the premises to a condition that would not damage DBD.

¶ 7. On appeal, Maxi Drug argues that the superior court erred (1) by implying lease terms that are directly contradictory to the express terms contained in the unambiguous lease, and (2) by finding that Maxi Drug violated the covenant of good faith and fair dealing implied in the lease. On cross-appeal, DBD argues that the court erred by not (1) requiring the tenants to restore the premises, (2) ruling that DBD was entitled to terminate the lease and eject Maxi Drug following GUMB's assignment of its interest in the property to Maxi Drug, and (3) awarding DBD compensatory damages for the cost of restoring the premises. Also on cross-appeal, C & S, GUM, and GUMB argue that the court erred (1) by not dismissing C & S and GUM from the case, (2) by finding that GUMB was involved in the renovation of the premises, and (3) by concluding that GUMB breached the covenant of good faith and fair dealing implied in the lease.

■ ¶ 8. The principal issue before us is whether the superior court erred by construing the lease to prohibit Maxi Drug from dividing the Grand Union space, setting up a Brooks Pharmacy in part of that space, and subletting the remaining space to another retailer. We review de novo the trial court's determination as to whether the agreement is ambiguous, as well as its construction of the terms of the agreement. See *Creed v. Clogston*, 2004 VT 34, ¶ 6, 176 Vt. 436, 852 A.2d 577; *Morrisseau v. Fayette*, 164 Vt. 358, 366, 670 A.2d 820, 826 (1995). While we may consider the circumstances surrounding the making of the agreement in determining whether its provisions are ambiguous, those circumstances "may not be used to vary the terms of an unambiguous writing." *Kipp v. Chips Estate*, 169 Vt. 102, 107, 732 A.2d 127, 131 (1999). "Where the terms of a lease are plain and unambiguous, they will be given effect and enforced in accordance with their language." *KPC Corp. v. Book Press, Inc.*, 161 Vt. 145, 150, 636 A.2d 325, 328 (1993); see *Maglin v. Tschannerl*, 174 Vt. 39, 45, 800 A.2d 486, 490 (2002) (when language in agreement is clear, parties' intention and understanding must be taken to be that which their agreement

declares); *Cross-Abbott Co. v. Howard's, Inc.*, 124 Vt. 439, 441, 207 A.2d 134, 137 (1965) (same).

■ ¶ 9. To be sure, we consider an agreement as a whole when examining its individual provisions, "but do not read terms into the contract unless they arise by necessary implication." *Morrisseau*, 164 Vt. at 366-67, 670 A.2d at 826; see *John A. Russell Corp. v. Bohlig*, 170 Vt. 12, 17, 739 A.2d 1212, 1217 (1999). Further, we may not insert terms into an agreement by implication unless the implication arises from the language employed or is indispensable to effectuate the intention of the parties. *Caverly-Gould Co. v. Village of Springfield*, 83 Vt. 396, 402, 76 A. 39, 41-42 (1910); see *Walgreen Ariz. Drug Co. v. Plaza Ctr. Corp.*, 647 P.2d 643, 646 (Ariz. Ct. App. 1982) (factors in determining whether to imply restrictive use conditions in contract are (1) whether implication arises directly from contract language; (2) whether language of contract demonstrates that parties clearly contemplated use restriction; (3) whether condition is legally necessary; (4) whether condition would have been made explicit if brought to parties' attention; and (5) whether contract completely covers subject matter of agreement). Vaguely implied conditions may not be inserted into an agreement, particularly when those conditions are inconsistent with the express language of the agreement, see *Hill v. City of Burlington*, 157 Vt. 241, 245, 597 A.2d 792, 794-95 (1991) (otherwise reasonable implication may not contradict clear and express language of contract), or when they impose a restraint on doing business, see *Cross-Abbott*, 124 Vt. at 444, 207 A.2d at 139 (provisions restricting liberty of doing business must be written in clear and unambiguous language rather than left to inference or interpretation); *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 184 (4th Cir. 2000) (generally, court is not free to insert by implication covenant of exclusive use when lease does not contain one; even when lease does contain express restrictive covenant, covenant is strictly construed to favor least restricted use of property); *United Assocs. v. Wal-Mart Stores Inc.*, 133 F.3d 1296, 1298 (10th Cir. 1997) ("As a general rule, implied covenants are disfavored."); *Monmouth Real Estate Inv. Trust v. Manville Foodland, Inc.*, 482 A.2d 186, 189 (N.J. Super. Ct. App. Div. 1984) (where landlord claims that commercial lease imposes limitation on use of premises, all doubts are resolved in favor of construction that least restricts use).

¶ 10. Here, the superior court found, and the parties agree, that the terms of the lease are unambiguous. The lease provides that the premises are

> to be used for the sale of goods *and any other lawful use including without limitation,* a use as supermarket for the preparation, storage, display and sale of groceries, meats, fish, delicatessen products, fruits, vegetables, bakery and dairy products, candy, tobacco products and beverages, and for the sale of such other goods and the rendition of such services as the Tenant may from time to time elect.

(Emphasis added.) The lease also provides as follows:

> The Tenant may assign this lease or sublet the demised premises, *or any part thereof,* for the purpose herein permitted, or *for any other lawful use* which will not be extra hazardous on account of fire without relieving Tenant, however, from its obligations hereunder. . . . [I]n the event of an assignment or subletting during a renewal term, the Tenant herein may, by notice to the Landlord, terminate any and all obligation and/or liability of the Tenant named herein accruing after the expiration of such renewal term.
>
> It is agreed, however, that the Landlord shall have the right to cancel and terminate this lease without further liability of either party to the other at such time as the Tenant's liability hereunder shall cease pursuant to the foregoing.

(Emphasis added.) Another provision relevant to Maxi Drug's argument is the following:

> The Tenant may from time to time at its expense paint and decorate the premises and make such changes, alterations, additions and improvements as will, in the judgment of the Tenant, better adapt the same for the purpose of its business. The alterations and additions shall be of such a character as not to adversely affect the value or decrease the cubical contents of the building.

¶ 11. We conclude that these provisions plainly and unambiguously permitted Maxi Drug to purchase the rights and obligations of the tenant under the lease and to alter the premises for use as a pharmacy and other retail business. First, the lease allows the tenant to assign or sublet the premises, or any part of it, "for any lawful use,"

and the landlord can terminate the lease based on any such assignment or subletting only if the tenant notifies the landlord that it intends to disclaim its liability under the lease. Second, the lease allows the tenant to operate the premises "for the sale of goods and any other lawful use including without limitation, a use as [a] supermarket." Thus, although the parties undoubtedly expected the tenant to use the premises, at least initially, as a supermarket, the lease explicitly allows other lawful uses. See *St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 206-07 (5th Cir. 1996) (word "including" is generally given expansive reading, even without additional language of "without limitation").

¶ 12. The parties could have drafted this provision to restrict use of the premises to the operation of a supermarket, as evidenced by another provision in the lease prohibiting the landlord from using the premises as a supermarket for three years in the event it failed to deliver the premises to Grand Union. See *Ingannamorte v. Kings Super Mkts., Inc.*, 260 A.2d 841, 841 (N.J. 1970) (lease provision required that store "be used and occupied only for a supermarket"). But, for whatever reasons, the parties to the lease in this case chose to allow any lawful use of the premises. We conclude that the lease's expansive use provision permits any reasonable, lawful use of the premises, including its use as a Brooks Pharmacy or other reputable retail establishment. See *Monmouth Real Estate*, 482 A.2d at 189 (provision in commercial lease that allowed "operation of a supermarket and drug store and any and all other lawful purposes" permitted any lawful use separate from and in lieu of supermarket rather than any lawful use incidental to supermarket, as claimed by landlord).

¶ 13. Finally, the lease allows the tenant to make alterations, additions, and improvements that better adapt the premises for the purpose of its chosen business, so long as those alterations do not adversely affect the value or decrease the cubical contents of the building. DBD has made no showing that Maxi Drug's plans adversely affect the value or decrease the cubical contents of the building; rather, DBD cites an irrelevant lease provision concerning the parties' respective responsibilities for repairs in support of its argument that the lease does not allow Maxi Drug's planned alterations. Moreover, neither the trial court's decision nor any other part of the record demonstrates that Maxi Drug's planned renovations will adversely affect the value or decrease the cubical contents of the building.

Accordingly, the lease did not prevent Maxi Drug from dividing and renovating the premises for the purpose of its business.

¶ 14. In support of its ruling that the lease precluded Maxi Drug from dividing the premises and operating any business other than a supermarket or comparable store, the superior court noted that DBD had set up a "community style" shopping center — the type that generally has a large "anchor store" to generate business surrounded by smaller satellite stores acting in a symbiotic relationship with the larger store. Essentially, the court inserted into the parties' lease by implication the type of use restrictions that the parties could have written into the lease to maintain such an arrangement. This the court could not do. "[N]o court may rewrite unambiguous contractual terms to grant one party a better bargain than the one it made." *Rouse-Randhurst Shopping Ctr., Inc. v. J.C. Penney Co.*, 171 F. Supp. 2d 824, 827 (N.D. Ill. 2001). The use provisions implied by the court did not arise from the language of the lease — in fact they were directly contrary to the language of the lease — and were not indispensable to effectuate the intention of the parties. See *Walgreen Ariz. Drug Co.*, 647 P.2d at 646 (court may not imply use conditions based on findings that conditions are necessary to make contract fair, that parties should have included conditions in agreement, or that contract would be improvident or unwise without conditions). The parties' intent can and must be discerned from the unambiguous terms of their agreement.

¶ 15. The court's reliance on the *Hinsman* cases is misplaced. In those cases, the landlord sought damages and possession of its leased premises after the tenant bank sublet the premises to someone operating a vegetable and fruit stand. In the first case, this Court noted that when a lease is silent as to the allowed use of the premises, the tenant has the right to put the premises to any use that is not materially different from the purpose for which the premises were constructed, adapted, and normally employed. *Hinsman v. Marble Sav. Bank*, 100 Vt. 48, 50, 134 A. 635, 636 (1926). In the second case, we concluded that use of the premises to operate a vegetable and fruit market was for a purpose materially different from the purpose for which the premises had been constructed, adapted, and normally employed. *Hinsman v. Marble Sav. Bank*, 102 Vt. 217, 220, 147 A. 270, 271 (1929). Here, in contrast, the parties' lease was not silent as to what uses were permitted; rather, the lease explicitly allowed any lawful commercial use. Nevertheless, the court inserted by implication use conditions that restricted the uses permitted under the lease. Assuming that we may imply into the lease a condition that any use be

reasonable, Maxi Drug's intended use of the premises by two established retail businesses is not unreasonable.

¶ 16. None of the seven factors cited by the trial court supports its decision to imply use provisions that are directly contrary to the terms of the parties' lease. The unified space outlined in the original architectural floor plans and the detail in the lease referencing specific uses connected with a supermarket demonstrate only the parties' recognition that, at least initially, Grand Union would be operating a supermarket on the premises; those plans and references are not inconsistent with the expansive uses explicitly permitted under the lease. Moreover, nothing in the parties' course of dealings over the years demonstrates that they intended to restrict the use of the premises to that of a supermarket or comparable store. Nor do speculative and vague predictions about the possibility of reduced rental income overcome the explicit language of the lease. Cf. *Monmouth Real Estate*, 482 A.2d at 189 (rejecting argument that lease provision basing rent on gross receipts showed parties' intent to limit use to supermarket). Nor does the lease require that the premises be occupied by a so-called "anchor store." In short, the trial court erred by rewriting the lease to meet the expectations of the parties as perceived by the court instead of implementing the unambiguous terms of the lease.

■ ¶ 17. Given our determination that the lease entitled Maxi Drug to divide the subject premises, we reject DBD's cross-appeal arguments. Because the lease permits the tenant to sublet any part of the premises and to make alterations and improvements to better adapt the premises to the purpose of its business, Maxi Drug acted within its rights in renovating the premises so that it could use part of the space for its own business and sublet the other part for use by another business. Therefore the court was not obligated, as DBD argues, to enjoin all renovation work, order Maxi Drug to restore the premises, and assess damages resulting from Maxi Drug's actions. Nor was DBD entitled to terminate the lease and eject Maxi Drug. The lease gives the tenant the option, following assignment or subletting, to disclaim liability under the contract, which would trigger the landlord's right to terminate the lease. DBD has failed to demonstrate that the trial court erred in finding that GUMB had not engaged in any conduct that reduced its liability to DBD, and that in fact GUMB had repeatedly confirmed its continuing obligations and liabilities under the lease. As the trial court noted, the indemnification agreement between

GUMB and Maxi Drug allocated risk and responsibility between those two parties, but did not affect GUMB's contractual obligations to DBD.

¶ 18. Our resolution of the principal issue also requires reversal of the superior court's determination that Maxi Drug and GUM violated the lease's implied covenant of good faith and fair dealing. "An underlying principle implied in every contract is that each party promises not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement." *Carmichael v. Adirondack Bottled Gas Corp.*, 161 Vt. 200, 208, 635 A.2d 1211, 1216 (1993). Generally, an implied duty of good faith and fair dealing "is not understood to interpose new obligations about which the contract is silent, even if inclusion of the obligation is thought to be logical and wise." *E. Shore Mkts.*, 213 F.3d at 182, 184 (covenant of good faith and fair dealing does not obligate party to take affirmative actions that party is not required to take under contract).

¶ 19. Although there may be instances in which a contracting party exercises a retained contractual right in bad faith, *Olympus Hills Shopping Ctr., Ltd. v. Smith's Food & Drug Ctrs., Inc.*, 889 P.2d 445, 451 (Utah Ct. App. 1994), that is not the case here. Neither Maxi Drug nor GUMB violated the terms of the lease or prevented DBD from obtaining the benefits provided under the lease. Cf. *Forrest Drive Assocs. v. Wal-Mart Stores, Inc.*, 72 F. Supp. 2d 576, 585 (M.D. N.C. 1999) (where lease entitled tenant to operate discount store in leased premises, tenant cannot have breached implied covenant of good faith and fair dealing by doing so). Although Maxi Drug did not disclose to DBD the extent and timing of its renovation plan, it entered into negotiations with DBD and informed DBD of its desire to divide the premises. Under the circumstances, neither Maxi Drug nor GUMB acted in bad faith.

¶ 20. Finally, C & S and GUM briefly argue in their cross-appeal that the trial court erred by not dismissing them from the case. The trial court dismissed all causes of action based on breach of contract with respect to C & S and GUM, but concluded that its injunctive relief should apply against those parties because all of GUMB's directors and employees also worked for GUM and C & S. Given our resolution of the issues on appeal, C & S's argument is moot, for all practical purposes. To the extent that it is not, however, we decline to disturb the trial court's decision not to dismiss C & S and GUM from the case.

*The superior court's March 18, 2003 decision is reversed insofar as it holds that the subject premises must be operated as a super-market or comparable store in a unified space, and insofar as it finds a violation of the lease's implied covenant of good faith and fair dealing. The injunction imposed by the superior court is vacated. The case is remanded for the superior court to enter judgment in favor of intervenor and defendants with respect to plaintiff's complaint and to consider intervenor's claim for damages.*