Filed 05/13/24

## STATE OF VERMONT

**SUPERIOR COURT**
Windham Unit

**CIVIL DIVISION**
**Docket No. 21-CV-2085**

THE STRATTON CORPORATION,
  **Plaintiff/Counterclaim Defendant**

v.

SNOWBRIDGE HOMEOWNERS ASSOCIATION, INC.,
  **Defendant/Counterclaim Plaintiff**

## DECISION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

The central issue in this lawsuit is which party is responsible for repair and maintenance of three bridges in the SnowBridge development, a 12-acre development of 36 trailside townhouses created by Stratton Corporation in 1997 adjacent to its Stratton Mountain Resort ski area. Stratton Corporation and the SnowBridge Homeowners Association, Inc. each seek a declaratory judgment on the issue.[1]

Stratton and the Association have filed cross motions for summary judgment on their respective claims for declaratory relief on the issue of responsibility for repair and maintenance of bridges. The material facts are undisputed. The parties dispute the proper interpretation of a key document and dispute the scope of facts and documents to be considered in deciding the issue. Stratton claims that the "SB Declaration" is the sole controlling document and that it unambiguously assigns responsibility for the bridges to the Association. The Association argues that the obligation lies with Stratton, claiming first that a number of documents should be consulted in the analysis and alternatively that the SB Declaration is not ambiguous and that review of them, along with course of conduct evidence, supports its position.

### Facts

Stratton Corporation owns and operates the Stratton Mountain Resort, a ski area in Windham County, although the resort label is also sometimes used to refer to a larger area that includes condominiums, residential properties, and commercial properties that have been developed over the years in conjunction with the recreational ski resort. Stratton's original Declaration, with terms and conditions governing resort property, is dated September 8, 1962. In 1994, Intrawest Corporation purchased the Stratton Corporation, but Stratton Corporation continued as a fully functional entity and it subsequently created the SnowBridge Development.

In 1996, Stratton applied for an Act 250 permit to create a trailside 36 unit townhouse project on 72.69 acres of its property. The site plan submitted with the application is a schematic

---

[1] The Association also pleads a breach of contract claim against Stratton on which the parties agreed to defer action at this time.

1

aerial view and is labelled "The Bridges" (Exhibit 23) although the project later became known as the SnowBridge Development. The site plan shows the proposed project as located off a Stratton road called Northbrook Loop Road. On the site plan a proposed road for the development turns off from Northbrook Loop Road and leads into the project area. Near the beginning of this project main road, the plan depicts a bridge labelled "Bridge Over Ski Trail." The ski trail is shown on the site plan and is labelled as "Cabot's Run." The site plan also shows a second bridge with the label "Bridge Over Stream," and it shows the course of the stream running underneath the bridge. Some of the townhouses are located on a secondary road off the main project road after the stream bridge. The main project road continues further northeast and crosses another ski trail labelled "Ethan's Alley" before arriving at a cul de sac where more townhouses are located. There is no depiction of a bridge over Ethan's Alley on the site plan, but there is now a bridge there that is the third bridge that is part of this case.[2]

In 1996-97, Stratton developed promotional materials in order to sell townhouses in the SnowBridge Development. The materials included an artist's rendering of a snow scene with a covered bridge typical of traditional Vermont covered bridges. This is the bridge located just off the turn from Northbrook Loop Road and constitutes the entry to the SnowBridge Development. The materials included the following invitation near the picture of the covered bridge: "You're invited to cross our bridge and enjoy the best in resort living."

The promotional materials also included a copy of the version of the Declaration proposed by Stratton at the time, as well as cost information including projected costs of Association fees. There is no mention of bridges in either of those documents. The SnowBridge Development project was created prior to Title 27A, the Uniform Common Interest Ownership Act (1994), and is not organized as a condominium under that law. It is a common interest community. Stratton offered to sell only individual townhouse lots to owners with a land area only large enough for a townhouse. All remaining land in the development was to be retained by Stratton for use by all as common area. Thus, unlike condominium owners, the townhouse lot owners would have no undivided fractional ownership interest in any common area.

The proposed Declaration described the creation of an owners' Association and described the rights and obligations of the owners as Association members. The cost information in the promotional materials listed the expenses to be borne by the Association and the projected amounts of Association fees to be borne by individual owners.

By March of 1997, Stratton had obtained and recorded the Act 250 land use and related State subdivision permits. Beginning in March of 1997, interested buyers began signing Purchase and Sales Agreements with Stratton.

On June 25, 1997, Stratton formed a wholly owned subsidiary corporation named Intrawest Stratton Development Corporation, or ISDC.

On August 22, 1997, Stratton deeded to ISDC a parcel of land that constituted the SnowBridge Development land. A corrective deed was executed on September 14, 1997. The acreage deeded to ISDC was 12.17 acres. The only reservations to the title in the deed were a right of way to International Paper, utility easements, and riparian rights reserved by Stratton to

---

[2] Exhibit 1 is the Act 250 material and shows that the third bridge was added to the plan in February of 1997.

the waters of the brooks and streams flowing through the property. ISDC thus became owner of the 12.17 acre SnowBridge Development project area.

As of September 14, 1997, the bridges had been built. On that date, ISDC and Stratton executed two easement documents, both signed by the same person on behalf of both Stratton and ISDC.[3] The first was a "Road Easement Agreement" in which ISDC obtained an easement from Stratton Corporation to use the Northbrook Wood Road for access to the project area. The second was a "Road and Ski Trail Easement Agreement" in which Stratton obtained from ISDC an easement for use of the road in the project area for the benefit of its retained property and an easement to operate, maintain, and use the ski trails for use by persons using Stratton facilities for skiing, snowboarding, bicycling, and hiking. It also includes the following provision:

> [ISDC] reserves the right, at its sole expense, to locate, install, construct, remove or relocate in, on, into, through, or under the Ski Trails, at points or in locations determined by [ISDC], bridges, overpasses, columns, tunnels, beams or other structures supporting [ISDC]'s improvements located above or under the Ski Trails, on the condition that [ISDC] does not interfere with Stratton's use and enjoyment of the Ski Trail Easement.

Association Exhibit 12. Thus, ISDC acquired the right to construct, remove, or change "structures supporting [its] improvements" over or under ski trails, specifically including bridges.

As of the date of these documents in September of 1997, some of the townhouses were ready for closing. Promotional materials and Purchase and Sale Agreements were still in the name of Stratton, though ISDC had become the owner.

On November 24, 1997, ISDC executed the Declaration of Covenants, Restrictions and Reservations of SnowBridge (Exhibit 21), referred to in this decision as the "SB Declaration."[4] This is the critical document on which both parties rely.

The SB Declaration states that "all the SnowBridge Property. . .shall be held, sold, conveyed, leased, mortgaged, and otherwise dealt with subject to the easements, covenants, restrictions, conditions, and reservations as hereinafter set forth. . ." It defines "Townhouse Lot" as "those parts of the SnowBridge Property now or hereafter designated as Townhouse Lots on the Plot Plan." The Plot Plan referred to is Exhibit 22 and is dated November 12, 1997. It shows for each numbered Townhouse Lot the "foundation footprint only." It shows the location of the main road and secondary road and driveways but it does not show any bridges, ski trails or streams.

The SB Declaration defines as "Common Areas" "all those parts of the SnowBridge Property not designated as Townhouse Lots." It further provides for the creation of an Association of Townhouse Owners as "an association of all Townhouse Owners within the Project, formed for the purposes of management, maintenance, operation and control of the Common Areas."

---

[3] Stratton acknowledges in its memorandum that there is complete identity of interest between Stratton and ISDC.
[4] This distinguishes it from the original 1962 Stratton Declaration, and from the proposed unsigned version given to prospective purchasers during the marketing of the project that was modified to become the SB Declaration version.

The SB Declaration breaks the "Common Areas" down into three classes:
"Common Areas—Common Roadways,"
"Common Areas—Limited," and
"Common Areas—General."

On the Plot Plan the "Common Areas-Common Roadways" are the main project road and the secondary project road. The "Common Areas—Limited" are the driveways off the project roads leading to each pair of townhouses. All the remaining land in the 12.17 acres constitutes the "Common Areas—General." Thus, owners own only the footprint of land on which their townhouse is located. ISDC retained ownership of all land in all three classes of "Common Areas."

The SB Declaration sets forth the responsibilities of the Association with respect to each of the classes of land. The Association's repair and maintenance responsibilities for each class are set forth in Article VII:

Common Areas—Common Roadways: "Repair and maintenance of the Common Areas—Common Roadways shall include, without limitation, general maintenance, paving and repaving, snow plowing, sanding, and salting."

Common Areas—Limited: "Repair and maintenance of the Common Areas—Limited shall include, without limitation, general maintenance, paving and repaving, snow plowing, sanding, and salting of the driveways serving two or more Townhouses."

Common Areas—General: "Repair and maintenance of the Common Areas—General shall include, without limitation, the maintenance, grooming, hardening, lawn mowing and landscaping of the Common Areas—General including the maintenance and operation of such common facilities as may be constructed or established within the areas designated as Common Areas—General."[5]

There is no mention of "bridge" or "bridges" in the SB Declaration. There is no definition of either "road" or "roadway," and no reference to any other source for definitions.

Shortly after the SB Declaration was executed, ISDC began closing on the sale of townhouse lots. ISDC signed the deeds to the owners as Grantor.

In late 1997 or early 1998, there was an Act 250 enforcement action related to the bridge over the stream. Details are unknown, but it is undisputed that Stratton was the only party to the enforcement action and took care of it.

On March 30, 1998, the Association was incorporated and it held its first meeting on April 4, 1998. On May 16, 1998, the Association approved a management agreement with Stratton whereby Stratton would provide property management services to the Association for the work that needed to be done by the Association to meet its repair and maintenance

---

[5] Under Article IV 3(a), ISDC retained the ability to "construct and maintain common facilities, including, but not limited to, community buildings, tennis courts, paddle tennis courts, skating rinks, swimming pools, and other recreational or community facilities on the Common Areas—General as it may from time to time determine to be desirable."

4

obligations. Stratton recommended a consulting firm to advise the Association on financial planning for its responsibilities, including capital reserves for items for which the Association was responsible in the future. Stratton's property management entity provided information to the independent consulting firm about projected costs for maintenance and repair for purposes of financial planning for the Association. There is no evidence that any Stratton entity gave notice to the Association that it expected the Association to be financially responsible for future maintenance and repair of the bridge support structures in addition to repair and maintenance of the road surfaces.

The Association has set forth as an undisputed fact that from 1997-2017, Stratton and/or ISDC maintained and monitored the bridges, provided property management services, assisted with the capital reserve process, and was involved with the Association's budget development process each year. Stratton claims that the inclusion of these facts goes beyond the agreed upon scope of the simultaneous motions for summary judgment.[6] Nonetheless, it also responded with documents showing that there were communications between Stratton representatives and Association board members on bridge issues and it attached minutes and agendas showing discussion items related to bridges. None of them show discussion of issues regarding financial or management responsibility for bridge repair and maintenance on the part of the Association.

In April of 2017, Alterra Mountain Company purchased Intrawest Corporation, which had purchased the Stratton Corporation in 1994. The same year, the issue of financial responsibility for bridge repair and maintenance arose. Engineering reports since then have indicated that significant structural bridge work is needed.[7]

## Analysis

Stratton argues that the SB Declaration unambiguously allocates responsibility for maintenance of the bridges to the Association. The Association argues that the SB Declaration is not ambiguous and does not require the Association to be responsible for the maintenance and repair of the bridges. It also argues that other documents support Stratton having responsibility for bridge repair and maintenance.

The SB Declaration is a contract to be construed by the court under contract law. *Madowitz v. Woods at Killington Owners' Ass'n*, 2010 VT 37 at ¶¶ 12-13.

The Vermont Supreme Court established guidelines for addressing claimed ambiguity in contract documents in the key case of *Isbrandtsen v. N. Branch Corp.*, 150 Vt. 575 (1988):

> The question of whether a contract term is ambiguous is a matter of law for the court to decide. *Trustees of Net Realty Holding Trust v. AVCO Financial Services of Barre, Inc.*, 144 Vt. 243, 248, 476 A.2d 530, 533 (1984). A provision in a

---

[6] This issue is addressed in the analysis section below.

[7] Stratton objected to the Association's specific facts about the extent of needed bridge work on the basis that the alleged facts are not material to the summary judgment issue because they relate to damages and not liability. Stratton produced no facts to place in dispute the overall fact that significant work on bridge structures is needed in the future. The court declines to treat as material facts the Association's specific projected costs of future work as they are not relevant to both parties' requests for a declaration as to liability.

contract is ambiguous only to the extent that reasonable people could differ as to its interpretation. *Id.* . . .Before extrinsic evidence may be used to aid in the construction of a written instrument, ambiguity must first be found."

*Isbrandtsen* at 577. (Citations omitted.)

The Court then reviewed approaches and reasoning adopted by other courts and commentators and concluded as follows:

we believe it appropriate, when inquiring into the existence of ambiguity, for a court to consider the circumstances surrounding the making of the agreement. Ambiguity will be found where a writing in and of itself supports a different interpretation from that which appears when it is read in light of the surrounding circumstances, and both interpretations are reasonable. . . .If ambiguity is found on that basis, the court may then rely on subordinate rules of construction in order to interpret the meaning of the disputed terms. . . . If, however, no ambiguity is found, then the language must be given effect in accordance with its plain, ordinary and popular sense.

*Id.* (Citations omitted).

The Court proceeded with its analysis in the case, concluding that "[i]n making its determination as to ambiguity in the instant case, the trial court properly considered evidence as to the circumstances under which the conveyance was made." *Id.* at 580.

The first question, then, is whether there is any ambiguity in the SB Declaration as to what party has the responsibility to maintain, repair, and make capital improvements to the three bridges in the SnowBridge Development.

*Ambiguity*

The SB Declaration is silent as to explicit responsibility for bridges. Stratton makes two arguments in support of its claim that there is no ambiguity: (1) the Association is responsible for "roads" and the bridges are part of the roads, and (2) the bridges are located under the roads, which are depicted as common areas on the Plot Plan. The Association counters that the SB Declaration only makes the Association responsible for surface maintenance of "roadways" and argues that that term refers to the road surface and not the underlying structural support elements of bridges.

Stratton relies on the definition of "road" in 23 V.S.A. § 4(13), which provides that "'Highway,' 'road,' public highway,' or 'public road' shall include all parts of any bridge, culvert, roadway, street, square, fairground, or other place open temporarily or permanently to public or general circulation of vehicles, and shall include a way laid out under authority of law." Thus it argues that the references in the SB Declaration to "road" encompass bridges. However, the SB Declaration contains no cross reference to Title 23 as providing the definition of "road," and no definition of "road" is contained in the SB Declaration itself.

The Association highlights that the maintenance obligation in the SB Declaration is only for "Common Roadways," and it relies on 23 V.S.A. §4(32), which provides that

6

"'Roadway' is that portion of a highway improved, designed, or ordinarily used for vehicular traffic, exclusive of the shoulder." The Association argues that the roadway is only the surface portion of a 'highway' as defined in Title 23, and furthermore that the dictionary definition of 'roadway' is 'the strip of land over which a road passes,' and 'the part of a bridge used by vehicles.' Thus, it argues that the SB Declaration's use of the term 'roadway' was not meant to include the supporting structural elements of the bridges. Again, with no definition of "roadway" in the SB Declaration and no cross reference to Title 23, there is no definition of scope of "roadway" responsibility pertinent to bridges.

Moreover, Title 23 of the Vermont Statutes Annotated is entitled "Motor Vehicles," and primarily addresses issues concerning vehicles and public safety. Prospective purchasers would not have had any reason to consult these statutory definitions to determine scope of Association responsibility.

While the SB Declaration clearly makes the Association responsible for repair and maintenance of the road *surfaces*, as shown by the specifics of paving, snowplowing, sanding, and salting, it is not specific that it assigns to the Association the obligation for maintenance and improvements of the significant structural elements of the bridges that support the road as it crosses over two trails and a stream and protects the features under them from the vehicular traffic above. The Vermont Supreme Court has ruled that it "may not insert terms into an agreement by implication unless the implication arises from the language employed or is indispensable to effectuate the intention of the parties." *Downtown Barre Dev. v. C & S Wholesale Grocers, Inc.*, 2004 VT 47, at ¶ 9. The long-term obligation for structural bridge maintenance is significant and cannot be implied from a defined obligation to pave, snowplow, and sand. Also, the covered bridge has an above-ground structure over the road that includes walls and a roof. This structure will also need periodic maintenance and repair over time but does not clearly fall within the definitions of either "road" or "roadway" relied on by the parties.

The SB Declaration allocates responsibilities in detail for many other features of the development.[8] Stratton argues that the responsibility of the Association for road surfaces (paving and repaving, snow removal, sanding, and salting) carries with it the responsibility for the bridges under the roads. However, the language of the SB Declaration is specific as to road surfaces. The court cannot conclude that those references are sufficient to make a clear transfer to the Association members of the much larger responsibility of long-term management and financial responsibility for three significant bridge structures fundamental to not only the *use* of the property by both parties but also the *safety* of Stratton recreational users in addition to townhouse owners.

In interpretating a condominium declaration in *Highridge Condo. Owners Assn. v. Killington/Pico Ski Resort Partners, LLC*, the Vermont Supreme Court considered what "[a]n ordinary person reading this declaration would easily understand." 2014 VT 120, at ¶ 15. The

---

[8] "Each Townhouse Owner shall be responsible for all interior and exterior maintenance of his Townhouse and shall promptly and diligently attend to such maintenance. Such maintenance shall include, but not limited to, the repair and replacement of windows, doors, roofs, siding, and all elements of the Townhouse Lot; repair and maintenance of foundations, footings, perimeter and footing drains; repair and maintenance of all utility services, plumbing, and mechanical systems located on the Townhouse Lot." Exhibit 21, Article VII, ¶ 1.

7

clear allocation in the SB Declaration of responsibility for *surface* road maintenance to the Association does not bear the weight of an unambiguous interpretation that it also covers responsibility for long-term structural maintenance of the supporting foundations of the bridges or the building constituting the cover of the covered bridge.

Stratton argues that the roads are common areas, and the bridges are located under the roads, so that a look at the Plot Plan, which accompanies the SB Covenant and is referenced in it, would indicate that the bridges under the roads are also common areas. However, the Plot Plan is a schematic drawing from an aerial view showing the location of townhouse lots. There are no details at all with respect to topography, roads, or bridges--not even that there are any bridges in the development. Again, this is insufficient to provide a clear transfer from ISDC, the owner of the land where the bridges are located, to the Association of the significant responsibility of future oversight, maintenance, repair, and replacement of the bridge structures.

The court is unable to give effect to any "plain, ordinary, and popular sense" of the language in the SB Declaration, as called for by *Isbrandtsen* ( if "no ambiguity is found, then the language must be given effect in accordance with its plain, ordinary and popular sense") because there are simply no terms in the document defining future responsibility for the structural underpinnings of the bridges, nor for the structure that covers the covered bridge. The absence of any provision for such a significant responsibility by itself causes ambiguity. Moreover, neither the term "road" nor the term "roadway," which are undefined in the document, support a reasonable unambiguous inference of allocation of such responsibility. There is a lack of clarity on the issue and reasonable persons can disagree as to the proper interpretation of the SB Declaration on the issue of responsibility for long-term bridge oversight, maintenance, and repair.

Thus, the court concludes that the SB Declaration is ambiguous on the subject of responsibility for maintenance and repair over time of the supporting structural aspects of the bridges and the structural cover of the covered bridge.

As a result, the court must rely on subordinate rules of construction, and specifically facts about circumstances at the time of the creation of the project, in order to determine the fair allocation of the responsibility. *Isbrandtsen* at 579; *Beldock v. VWSD, LLC*, 2023 VT 35, at ¶ 28.

*Circumstances at the time of Creation*

The project was developed through a series of steps that started in 1996, when Stratton applied for the Act 250 permit, and concluded with the first meeting of the Association in 1998. The material facts concerning these events are undisputed.

The terms of all documents available to all parties when the closings on the sale of lots began are undisputed. The documents are:

Act 250 site plan (Exhibit 1)
Promotional materials: Covered Bridge picture with invitation to "cross our bridge" (Exhibit 2)
Promotional materials: "Estimated Ownership Costs" to be borne by owners through Association fees (Exhibit 3, page 11)

8

Promotional materials: proposed unsigned version of SB Declaration at time initial purchasers signed purchase and sales agreement (Exhibit 4, page 25)

Road Easement Agreement (Exhibit 11)

Road and Ski Trail Easement Agreement (Exhibit 12)

SB Declaration (Exhibit B, Exhibit 21)

Plot Plan accompanying executed SB Declaration (Exhibit C, Exhibit 22)

An important circumstance at the time of creation is the nature and function of the bridges. They are a critical feature of the development with significant impact on the interests of both Stratton and the townhouse owners. The bridges not only support the road that provides access to 36 townhouses, but two of them allow the skiers and recreational users of the Stratton Resort to pass uninterrupted under the bridges on the Stratton ski trails. The third protects the stream on which Stratton holds riparian rights. The covered bridge serves as a gateway to the SnowBridge development and when it was built it immediately became an iconic symbol used for promotional purposes for Stratton. It is not just a support for the road but is an attractive structure with historical references, and its special name, SnowBridge, defines the identity of the development as a whole.

As a matter of function, bridges need to be designed, engineered, and constructed for safety for both users of any road they support, and in this case, the skiers and other recreational users on the trails below. They are by their nature intended to function for lengthy periods into the future and require ongoing inspection, maintenance, and renovation over time. It is inherent in the building of a bridge that there will be future costs. Moreover, a transfer to the Association of the responsibility for maintenance and repair would normally be accompanied by an easement on adjacent land allowing for such maintenance and repair to take place, such as access of equipment for excavation and grading of land necessary for maintenance and replacement of supports. In the case of the covered bridge, it is not just the structural support parts but the maintenance of the above-road structure of the bridge's cover, which is essentially a building that enhances the environment of the development as a whole and calls for aesthetic maintenance.

If Stratton and/or ISDC intended to shift such a significant future responsibility and/or expense to townhouse lot owners through the Association, or if they wanted to retain oversight and decision making about what needed to be done but shift the payment of costs to the Association, it was incumbent on them as drafters of the documentation to make such terms explicit. "It is a general rule of construction in Vermont that a doubtful provision in a written instrument is construed against the party responsible for drafting it: "This result is strengthened by the rule construing a doubtful provision against the party responsible for drafting it." *Page v. Lyle H. Hall, Inc.,* 125 Vt. 275, 279, 214 A.2d 459, 463 (1965). "In the present case, plaintiffs' predecessor in interest drafted paragraph 25. Thus, any ambiguities in its provisions must be resolved against plaintiffs." *Trustees of Net Realty Holding Tr. v. AVCO Fin. Servs. of Barre, Inc.,* 147 Vt. 472, 475–76 (1986).

The development documents, and specifically the SB Declaration, were created by or on behalf of Stratton and/or ISDC, both of which retained legal rights in the subject property, including both rights of use and ownership. None of the documents contain terms clearly assigning responsibility for future bridge repair and maintenance to the Association.

9

Nor can the court conclude that the owners had notice that payment for costs of future repair and maintenance of the structural elements of the bridges would be the responsibility of the Association for which they would need to plan capital reserves. To the extent there was notice to prospective purchasers and owners about financial responsibility, it was set forth in the projections of the expenses and amounts the Association owners would need to pay annually. These projections did not include future bridge maintenance. While the "Estimated Ownership Costs" document refers to the possibility of special assessments, there is no mention of bridges or even roads in that document.

This was not a situation in which the developer, whether Stratton or ISDC, was creating a project such as a condominium complex whereby all incidents of ownership, rights of use, and obligations would ultimately be transferred to the owners, with the developer retaining no interest in the property or project after it was fully developed. In such a case, the purchaser/owners would reasonably have to expect to become responsible for the bridges over time. On the contrary, the documents make clear that both Stratton and ISDC retained significant long term interests of their own in the premises, including an easement to Stratton broad in scope for ongoing resort purposes and the ability of ISDC to decide to construct additional recreational facilities on common areas. Stratton and ISDC would therefore continue to exercise rights and benefits for their own independent advantage well into the future. The ability of Stratton to use the covered bridge for promotional purposes related to the Stratton Resort as a whole, in addition to it being a feature of the ski trail system, is significant, and makes it reasonable that Stratton would retain control over the ability to make sure it was properly maintained over time. This inherently involves the financial obligation for such maintenance, absent explicit terms to the contrary.

Another circumstance at the time of creation is that ISDC was specifically made the owner of the property on which the bridges are located. An owner is normally responsible for all structures and fixtures on its property. No ownership interest in either the bridges or the underlying real property was transferred to lot owners at the time of creation, and there was no indication of any plan to do so. Thus, the default obligation for the structures on the real property rested with ISDC unless otherwise provided for, which it was not. No easements to facilitate bridge repair, maintenance, or replacement were created, which is consistent with Stratton/ISDC responsibility for the bridges as none would be needed by ISDC as owner of the Common Areas.

Consideration of all the circumstances at the time of creation of the SB Declaration shows that:

- ISDC is the owner of the real estate that includes the three bridges at issue and is therefore presumptively responsible for their maintenance;
- Stratton/ISDC was responsible for the drafting of the SB Declaration in which there is no assignment of future financial responsibility for the repair and maintenance of the support and structural features of the bridges;
- Although the SB Declaration specifically made the owners (through the Association) responsible for repair and maintenance of road surfaces, the terms of those provisions are not sufficient to extend the responsibility to include

10

maintenance of the structural elements of the bridges or the cover of the covered bridge;

- Stratton was responsible for the promotional materials that notified prospective purchaser/owners of the future expenses for which the Association would be responsible and did not include any projected costs for future bridge repair and maintenance, despite the obvious predictability of significant costs for the bridges over time;
- Stratton and ISDC, which have an identity of interest, retained legal interests in the ability to use the bridges for resort, recreational, and promotional purposes of their own which gave them good reason to maintain control over the condition of the bridges; and
- The Road and Ski Trail Easement Agreement between Stratton and ISDC provides that ISDC "reserves the right, at its sole expense," to exert significant control and make changes to "bridges. . .or other structures supporting [IDSC]"s improvements above the ski trails," thereby reflecting a recognition that the responsibility for bridges was retained by Stratton/ISDC and not assigned to the Association.

Given all these factors about the circumstances at the time of creation, the court resolves the ambiguity in the SB Declaration by holding that since Stratton/ISDC did not make the Association responsible for repair and maintenance of the structural elements of the bridges (as opposed to the road surfaces), the obligation to do so remained with the owner of the underlying real estate, which is ISDC.[9]

*Course of conduct*

The Association also relies on facts that Stratton took responsibility for the structural elements of the bridges for 20 years after the creation of the development, from 1997 to 2017, as evidence of course of conduct. Stratton claims that the inclusion of what occurred after the SB Declaration goes beyond the agreed upon scope of the simultaneous motions for summary judgment. The court has no knowledge of an agreement between the parties of the scope of the motions, as no stipulation was filed with the court and no information about any such agreement was provided.

Stratton was on notice that ambiguity was the disputed issue, and that under *Isbrandtsen,* the key case on ambiguity, if ambiguity is found, "the court may then rely on subordinate rules of construction in order to interpret the meaning of the disputed terms," *Isbrandtsen* at 579, and that such rules of construction could include course of conduct facts. Indeed, the Court in *Isbrandtsen* quoted the Restatement of Contracts on the issue, as well as other commentators: "See Restatement (Second) of Contracts § 212 comment b (1981) ( "Any determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties."). *Id.* at 578. Therefore, it is not

---

[9] As noted above, Stratton claims an identity of interest with ISDC. Full terms between Stratton and ISDC, its wholly owned subsidiary, are not in evidence. The court does not determine responsibility as between them.

unreasonable for the Association to have included material facts concerning course of conduct in support of its motion for summary judgment.

Stratton responded to the Association's facts about what occurred during 1997-2017. It did not dispute the Association's facts that Stratton monitored and maintained the bridges over this 20 year period. Rather, it noted that communications between Stratton representatives and Association board members took place on bridge issues as referenced in minutes and agendas showing discussion items related to bridges. None of those documents reflect Association financial responsibility for bridge repair and maintenance, or any claim made prior to 2017 that the Association was financially responsible for repair and maintenance.

Thus, the course of dealing evidence supports the Association's position that the responsibility for oversight of the condition of the bridges and for financial costs of repair and maintenance was not assigned to the Association. The course of conduct evidence reinforces the legal conclusion that the court has reached above based only on circumstances at time of creation.

For the foregoing reasons, the court concludes that the Association is not responsible for oversight, maintenance, and repair of the structural components of the three bridges in the SnowBridge Development.

## Order

Based on the analysis above,

1. Defendant's Motion for Summary Judgment (Motion #19) is *granted,*

2. Plaintiff's Motion for Summary Judgment (Motion #20) is *denied,*

3. Defendant's counsel shall prepare a proposed form of declaratory judgment for review by Plaintiff's counsel pursuant to V.R.C.P. 58 (d), and

4. By June 21, 2024, the attorneys shall submit an updated pretrial scheduling order to address the remaining claim in the case.

Electronically signed May 13, 2024 pursuant to V.R.E.F. 9 (d).

Mary Miles Teachout
Superior Judge (Ret.), Specially Assigned

12