2003 VT 10

**Marcel ROBERTS, David Currier and Roberts Real Estate v. Robert CHIMILESKI, William Davies, Robert Davis, Gregory Howe, Michael Loignan, John Monette and Andrew Pepin**

[820 A.2d 995]

No. 01-158

¶ 1. February 7, 2003. This appeal involves legal malpractice claims arising out of the formulation of a development scheme that sought to circumvent Act 250 permit requirements. Plaintiffs Marcel Roberts and David Currier appeal a superior court decision upholding the findings of a special master denying recovery for legal malpractice against defendants Robert Chimileski, William Davies, Robert Davis, Gregory Howe, Michael Loignon, John Monette, and Andrew Pepin. Plaintiffs contend that (1) the special master should not have heard expert testimony to establish the standard of care of a Vermont attorney with regard to the practice of reviewing Environmental Board decisions; and (2) the failure to disclose the inherent risk of a development plan in questionable conformity with an unsettled area of the law constituted legal malpractice as a matter of law. We affirm.

¶ 2. As found by the special master and adopted by the trial court, the facts are as follows. In July 1984, Roberts, a real estate developer, consulted attorney Monette about Act 250 permit requirements concerning the subdivision of land into ten or more lots. At that time, Act 250 had just been amended to define a "lot" as any undivided interest in land and not just parcels under ten acres. See 10 V.S.A. § 6001(11). Additionally, the 1984 version of 10 V.S.A. § 6001(19) defined "subdivision" as

a tract or tracts of land, *owned or controlled* by a person, which have been partitioned or divided for the purpose of resale into ten or more lots within a radius of five miles of any point on any lot, and within any continuous period of 10 years after the effective date of this chapter. In determining the number of lots, a lot shall be counted if any portion is within five miles.

10 V.S.A. § 6001(19) (1984) (amended 1987) (emphasis added). Thus, after the 1984 amendment of subsection 11, developers subdividing land into lots of any size needed to acquire an Act 250 permit if they "owned or controlled" the land being subdivided. See 10 V.S.A. § 6081(a) (no person may sell any interest in a subdivision without a permit).

¶ 3. In response to his inquiry, Monette advised Roberts that subsequent land sales could still occur legally without a permit if the original owner prepared the subdivision first and then conveyed the lots to Roberts so that Roberts would not "control" the lots during subdivision. Under this arrangement, Roberts would cover the costs and handle the preparation of the subdivision plan. Monette and Howe concede, however, that the definition of "control" was legally ambiguous at the time. There is no evidence that any of the defendants warned Roberts and his associates of the potential illegality of this modus operandi ("m.o."), apparently believing that they had no duty to advise plaintiffs of the m.o.'s risk because it was too remote and tenuous.

¶ 4. Roberts and his associates, including plaintiff Currier, subsequently completed over 100 real estate transactions employing the m.o. between 1984 and 1990. Roberts and his associates were represented mostly by Howe and Monette and occasionally by the other defendants in both the purchase and sale of these properties.

¶ 5. In 1987, the Vermont Environmental Board issued declaratory rulings in *In re Eastland*, Decl. Ruling #177 (Vt. Envtl. Bd. June 29, 1987), and *In re Vitale*, Decl. Ruling #183 (Vt. Envtl. Bd. July 9, 1987), holding that a permit was required under circumstances very similar to the m.o. because a buyer who manipulated the property before a sale fell within Act 250's definition of "control." The Board's decisions were not widely circulated although a brief description of the pending appeal to this Court in *East-*

*land* appeared in a 1988 issue of the Vermont Bar Journal. In 1989, this Court affirmed the Environmental Board's *Eastland* decision, *In re Eastland, Inc.*, 151 Vt. 497, 562 A.2d 1043 (1989), and the opinion was circulated to attorneys who received this Court's decisions through subscription.

¶ 6. Upon learning of the Supreme Court's *Eastland* decision, Monette and Howe advised Roberts and Currier that the decision raised serious doubts about the legality of the m.o. Roberts and Currier proceeded to make one more m.o. transaction after receiving this information. The State subsequently prosecuted Roberts and Currier for making illegal subdivisions between 1986 and 1990.

¶ 7. Roberts and Currier commenced this malpractice action in 1993 against Howe, Monette, and several other attorneys who had represented Roberts and Currier in m.o.-type transactions. Roberts and Currier argued that defendants had breached the standard of care of a Vermont attorney by failing to research and advise them of the ambiguous meaning of "control" with regard to Act 250 jurisdiction from 1985 to this Court's 1989 *Eastland* decision. With the exception of Monette and Howe, all of the defendants filed motions to sever that were deferred to the conclusion of the trial. Monette and Howe then filed a motion for summary judgment, arguing that the standard of care did not require them to review Environmental Board annotations and that their conclusions were made on a then-unsettled area of the law without the benefit of hindsight. The trial court denied the motion for summary judgment and then granted the parties' request for a trial by a special master. Both parties presented expert testimony regarding the standard of care for a Vermont attorney during the ten-day trial before the special master.

¶ 8. In his final report, the special master made the following findings and conclusions of law: (1) an attorney in Ver-

mont does not breach the standard of care if the attorney conducts reasonable research into an unsettled area of the law and informs the client of the risks involved in proceeding under an unsettled interpretation; (2) Monette and Howe had not conducted reasonable research because they had failed to review the Environmental Board declaratory rulings, annotated in the Board's rules; (3) the failure to review the Board's annotations was not the proximate cause of plaintiffs' injury because such research would not necessarily have revealed the *Eastland* decision or any other ruling that would have changed the assessment of the m.o.; (4) Monette had breached the standard of care through his representation in the one m.o. transaction that occurred after our *Eastland* decision, in which he failed to advise Roberts of the risk; and (5) Monette had no liability for the post-*Eastland* transaction because Roberts had already been informed of the *Eastland* decision and the potential risk of the m.o. and had "knowingly and voluntarily assumed the risk."

¶ 9. The trial court upheld the master's findings, added its own conclusions, and dismissed with prejudice all claims against Howe, Monette, and the other defendants. The court concluded that defendants could not be held negligent for their participation in the m.o. because the definition of "control" was a professional opinion regarding the interpretation of an unsettled area of the law, and they were thus shielded by the "judgmental immunity" doctrine, which protects attorneys from liability when their opinions are based on speculation into an unsettled area of the law. In terms of whether defendants could be held negligent for their alleged failure to perform adequate research, the court agreed with the special master's findings that a reasonable, careful, and prudent Vermont attorney would have reviewed Environmental Board case annotations — something defendants failed to do — but that

such a review would not have disclosed any reason to question the assessment of the m.o. The court further found that plaintiffs had failed to prove that there was a prevailing practice to go behind the published annotations and study the full Board decisions. Thus, plaintiffs had failed to prove a standard of care that defendants breached and which breach was the proximate cause of harm to plaintiffs. The trial court did not address whether defendants could be found negligent for failure to inform plaintiffs of the risks associated with their advice that the m.o. was lawful. Plaintiffs subsequently brought this appeal.

¶ 10. Plaintiffs first challenge the trial court's finding that they failed to demonstrate that the existing standard of care for a Vermont attorney required an investigation beyond the annotations to review the Environmental Board's decisions. Plaintiffs argue that under *Estate of Fleming v. Nicholson*, 168 Vt. 495, 724 A.2d 1026 (1998), the court should have looked to common knowledge instead of expert testimony to determine whether Monette and Howe had breached the standard of care. We disagree.

¶ 11. We held in *Nicholson* that expert testimony is not necessary to determine the elements of negligence "[w]here a professional's lack of care is so apparent that only common knowledge and experience are needed to comprehend it ...." *Nicholson*, 168 Vt. at 497-98, 724 A.2d at 1028. In doing so, we distinguished *Nicholson* from *Tetreault v. Greenwood*, 165 Vt. 577, 578, 682 A.2d 949, 950 (1996) (mem.), where we found that expert testimony was required to demonstrate that a Vermont attorney had breached the standard of care by failing to discover subdivision permit violations during a title search. Our holding in *Nicholson* concerned the nondisclosure of title information, not the methods employed to conduct a title search unique to the legal profession in Vermont at issue in

*Tetreault. Nicholson,* 168 Vt. at 498, 724 A.2d at 1028-29.

¶ 12. The question of whether Monette and Howe should have reviewed Environmental Board decisions is more analogous to the central determination in *Tetreault,* because it involves the methods involved in researching the legality of a subdivision, an undertaking unique to the legal profession. Such a determination requires the guidance of expert opinion. Therefore, we uphold the trial court's determination that the expert testimony presented by plaintiffs failed to demonstrate that the review of Environmental Board decisions was, under the circumstances, required of a reasonably competent Vermont attorney.

¶ 13. Plaintiffs also argue that the trial court erred in granting judgmental immunity for Monette's and Howe's failure to disclose the potential risk of the m.o. transaction, asserting that judgmental immunity does not apply to nondisclosure of the risk involved. Plaintiffs point out that the unsettled definition of "control" should have obliged Monette and Howe to advise their clients about the risky nature of the m.o. Plaintiffs argue that defendants are liable under this informed consent as a matter of law despite the expert testimony that defendants were not negligent.

¶ 14. The record reflects that plaintiffs' counsel slowly came to the recognition that the theory on which they pled the case — that defendants were negligent in advising that the m.o. complied with Act 250 — was not as good as the theory that they argue here — that defendants were negligent in failing to advise plaintiffs of the legal risks of the m.o. They particularly came to this recognition when their primary theory ran up against the judgmental immunity defense, applicable because the law was unsettled. The problem is that they started presenting this alternative theory to the trial court — and then only obliquely — after the evidence was closed. While the arguments of plaintiffs' counsel began to reflect the new theory, plaintiffs' evidence never did. Indeed, neither the special master nor the superior court perceived that plaintiffs were making this argument, and neither addressed it. As is so often the case, plaintiffs fully stated their new theory for the first time only in this Court, after their initial theory failed in the trial court. Therefore, we find that plaintiffs failed to raise below and offer sufficient proof for their informed consent theory, and we will not address this issue here. *State v. Bressette,* 130 Vt. 321, 322, 292 A.2d 817, 818 (1972) (this Court will not review questions on appeal unless "the trial court had a fair opportunity to consider, evaluate and rule upon such question[s]").

¶ 15. In fact, this case demonstrates why it is critical that we consider an issue on appeal only if it is fully presented to the trial court. A legal malpractice action is at base a negligence action: plaintiff must prove that the attorney was in fact negligent and that this negligence was the proximate cause of plaintiff's injury. *Nicholson,* 168 Vt. at 497, 724 A.2d at 1028. We have emphasized that an element of proximate cause in lawyer malpractice actions is "cause-in-fact." *Knott v. Pratt,* 158 Vt. 334, 336, 609 A.2d 232, 233 (1992); *Brown v. Kelly,* 140 Vt. 336, 338, 437 A.2d 1103, 1104 (1981). Plaintiffs had a simple theory of cause-in-fact for their original negligence theory — defendants' negligence in advising plaintiffs that the m.o. was lawful caused plaintiffs to incur penalties and other damages when it turned out that the development without an Act 250 permit was unlawful. The informed consent theory, however, requires a different showing of cause-in-fact — that plaintiffs never would have entered into the unlawful development scheme if they were aware of the legal risks in using the m.o. Plaintiffs never made that showing. Indeed, their testimony indicates that they would have gone forward with the unlawful develop-

ment scheme even in the face of a risk disclosure, as Roberts did even after he was aware of the *Eastland* decision. Putting aside that plaintiffs never sought a finding that the lack of a risk disclosure was a proximate cause of their damages, neither the special master nor the superior court could have made such a finding on the evidence presented. See *Brown*, 140 Vt. at 338-39, 437 A.2d at 1104-05 (lawyer not liable for damages in malpractice action for negligent failure to search for attachable assets of judgment debtor on behalf of plaintiff because evidence showed that no such assets existed and, therefore, proximate cause was absent as a matter of law).

¶ 16. Even if there was evidence that plaintiffs' actions would have been influenced by a risk disclosure, that evidence must be based in turn on some showing of what kind of risk disclosure was required. Undoubtedly, plaintiffs' conduct may have been influenced by the nature of the disclosure defendants should have made. Plaintiffs try to skate over this proof element with the simple response that defendants made no risk disclosure and, therefore, there is no need to get into what disclosure should have been made. Since we are not prepared to eliminate the causation requirement from the tort, we cannot accept this as an adequate answer.

¶ 17. Further, our holding that expert testimony is required for plaintiffs' primary theory applies equally here to the alternative theory. Indeed, the case was tried as a battle of the expert witnesses. Yet, no expert witness testified that defendants were negligent in failing to make a risk disclosure, and none described what disclosure, if any, should have been made. Without such testimony, it is impossible for the special master and the trial court, as well as for this Court, to determine the boundaries of permissible attorney conduct with the care and narrowness that the subject matter requires.

¶ 18. Plaintiffs would have us announce a broad new doctrine of lawyer malpractice liability based on a record that is wholly inadequate to make this decision. It may be that this Court should recognize malpractice liability based on the failure of the lawyer to obtain the informed consent of the client for the lawyer's proposed course of action, but it should not adopt that doctrine on this record.*

―――――

* Our refusal to decide this significant issue on such an insufficient record is further supported by the lack of clear consensus among the mere handful of decisions around the country on malpractice liability based on lack of informed consent. Compare *Williams v. Ely*, 668 N.E.2d 799, 806 (Mass. 1996) ("The problem is not that [defendant] gave reasonable advice that in time proved to be wrong. The problem is that the apparent certainty of the opinion given, at a time when the issue was not conclusively resolved, denied the plaintiffs the opportunity to assess the risk and to elect to follow [another course]."); *Wood v. McGrath, North, Mullin & Kratz, P.C.*, 589 N.W.2d 103, 106 (Neb. 1999) ("[A]n allegation that an attorney did not properly inform a client of relevant unsettled legal issues does not provide the same need for immunity from suit as does an attorney's judgment or recommendation in an area of unsettled law."); *First Nat'l Bank of Clovis v. Diane, Inc.*, 698 P.2d 5, 10 (N.M. 1985) ("It is not the fact that defendant incorrectly interpreted the statutes that renders him liable; it is the failure to warn of potential liability to the client of adverse consequences which could result.") with *Smith v. St. Paul Fire & Marine Ins. Co.*, 366 F. Supp. 1283, 1290 (M.D. La. 1973) ("[I]f the attorney has reason to believe, or should have reason to believe that there could be some adverse consequences from taking the course advised, he is obligated to so

¶ 19. We therefore uphold the ruling of the trial court, based on the trial court's reasoning. First, we agree that since the legality of the m.o. was unsettled at the time, see *Eastland*, 151 Vt. at 499, 562 A.2d at 1044 ("the meaning of 'controlled' in § 6001(19) is not entirely plain"), defendants are shielded from liability for their participation in the m.o. by the judgmental immunity doctrine. See 3 R. Mallen & J. Smith, Legal Malpractice § 18.1, at 2 (5th ed. 2000) ("the rule that an attorney is not liable for an error of judgment on an unsettled proposition of law is universally recognized"). Second, we agree that defendants cannot be held negligent for performing allegedly inadequate legal research since, as both the special master and the trial court found, plaintiffs failed to establish that defendants' breach of the standard of care pertaining to legal research — which was determined by the expert witnesses and which did not include going behind published annotations and studying the full Board decisions — proximately caused harm to plaintiffs. See *Nicholson*, 168 Vt. at 497, 724 A.2d at 1028 (plaintiff alleging negligence has burden of proving standard of care, breach of that standard, and harm proximately caused by breach); *LaFaso v. LaFaso*, 126 Vt. 90, 96, 223

_____

advise his client. But if there is no reasonable ground for him to believe that his advice is questionable, he certainly has no obligation to advise clients of every remote possibility that might exist."); *Conklin v. Hannoch Weisman*, 678 A.2d 1060, 1070 (N.J. 1996) ("[W]e find no persuasive need to introduce into attorney malpractice the subjective standard of informed consent . . . ."); 4 R. Mallen & J. Smith, Legal Malpractice § 30.41, at 575-76 (5th ed. 2000) (noting that *Wood*, which involved the settlement of a divorce action, raises "the risk that settlement recommendations will be challenged by hindsight revelations of alternatives").

A.2d 814, 819 (1966) (existence of negligence ordinarily question for finder of fact).

*Affirmed.*

¶ 20. **Morse, J.**, dissenting. That defendants ignored the patent ambiguity and legal uncertainty inherent in the term "controlled" in 10 V.S.A. § 6001(19) hardly requires an expert opinion to establish. Defendants' negligent failure to communicate that uncertainty, and the associated risks, was alleged below as surely as plaintiffs' other, more obscure claims of negligent research. Plaintiffs should not be penalized merely because the trial court failed to address the obvious. Indeed, it was the place to start the analysis and, given the obvious incompatibility of defendants' modus operandi ("m.o.") with the statute, the place to end the analysis.

¶ 21. It requires no extensive discussion to establish that the unsettled scope of the term "controlled" in § 6001(19) obligated defendants to advise their clients about the risky nature of their scheme, or m.o., to circumvent Act 250 requirements. Judgmental immunity shields attorneys only from liability arising out of advice based on reasonable research into an unsettled area of the law. 3 R. Mallen & J. Smith, Legal Malpractice § 18.1, at 2-5 (5th ed. 2000). While the meaning of "controlled" under the statute may have been unsettled at the time of plaintiffs' scheme, the risk that it might include buyers who manipulate a property before a sale was sure to be deduced by any minimally competent lawyer. No research, and certainly no definitive administrative or judicial interpretation, was required to reach this conclusion.

¶ 22. Furthermore, judgmental immunity does not extend to a failure to advise a client of the risks associated with an action of questionable legality. "The attorney's responsibilities to the client may

not be satisfied concerning a material issue simply by determining that a proposition is doubtful or by *unilaterally* deciding the issue. When there are reasonable alternatives, the attorney should inform the client that the issue is uncertain, unsettled or debatable and allow the client to make the decision." *Wood v. McGrath, North, Mullin & Kratz, P.C.*, 589 N.W.2d 103, 106 (Neb. 1999) (citing 2 R. Mallen & J. Smith, Legal Malpractice § 17.15, at 531-32 (4th ed. 1996) (emphasis added); see also *Williams v. Ely*, 668 N.E.2d 799, 806 (Mass. 1996) ("The problem is not that [defendant] gave reasonable advice that in time proved to be wrong. The problem is that the apparent certainty of the opinion given, at a time when the issue was not conclusively resolved, denied the plaintiffs the opportunity to assess the risk and to elect to follow [another course]."). "Thus, an allegation that an attorney did not properly inform a client of relevant unsettled legal issues does not provide the same need for immunity from suit as does an attorney's judgment or recommendation in an area of unsettled law." *Wood*, 589 N.W.2d at 115.

¶ 23. At the time defendant Monette suggested the m.o. to plaintiffs, the full extent of the meaning of "controlled" was at best doubtful, but the potential risks of the m.o. were obvious, if "controlled" meant anything. Indeed, defendants Monette and Howe conceded that the definition of "control" was legally ambiguous at the time. Yet despite this doubt, no warning was given to plaintiffs. Although the special master's findings do not contain a specific account of Monette's advice regarding the risks associated with the m.o., both defendants and the trial court accept plaintiffs' assertion that Monette failed to advise plaintiffs of *any* potential risk.

¶ 24. The trial court avoided a finding of negligence based, in part, on its observation that developers seeking legal advice about avoiding a statutory permit requirement assume an "inherent" risk. In so noting, the court mischaracterized the m.o. as one of plaintiffs' invention, when in fact the special master found that defendant Monette had developed the m.o. and presented it to plaintiffs. Furthermore, the risks associated with such a patently questionable scheme are not "inherent," but rather form the core of information that must be communicated to a client by a lawyer to ensure an informed decision. See *Smith v. St. Paul Fire & Marine Ins. Co.*, 366 F. Supp. 1283, 1290 (M.D. La. 1973) ("[I]f the attorney has reason to believe, or should have reason to believe that there could be some adverse consequences from taking the course advised, he is obligated to so advise his client."); *First Nat'l Bank of Clovis v. Diane, Inc.*, 698 P.2d 5, 10 (N.M. 1985) ("It is not the fact that defendant incorrectly interpreted the statutes that renders him liable; it is the failure to warn of potential liability to the client of adverse consequences which could result.").

¶ 25. Nor can liability be avoided on the questionable ground that plaintiffs engaged in one additional transaction after defendants belatedly informed them of the risks. Plaintiffs had already completed more than 100 such transactions, and can readily be excused for exhibiting a certain reluctance — at that point — to believe that everything they had previously accomplished on their lawyers' advice was illegal. Such evidence is hardly sufficient to disprove that — given a timely and accurate assessment of the risks — plaintiffs would not have engaged in such a scheme in the first place.

¶ 26. I would therefore reverse the judgment in favor of defendants, and remand for a determination of damages.