2008 VT 40

# Century Partners, LP v. Lesser Goldsmith Enterprises, Ltd., et al.

[958 A.2d 627]

No. 06-490

Present: **Reiber, C.J., Johnson, Skoglund and Burgess, JJ., and Toor, Supr. J., Specially Assigned**

Opinion Filed March 28, 2008

Motion for Reargument Denied June 4, 2008

*Mark L. Sperry* and *Wanda I. Otero-Ziegler* of *Langrock Sperry & Wool, LLP*, Middlebury, for Plaintiff-Appellant.

*Robert F. O'Neill* and *Ross A. Feldmann* of *Gravel and Shea*, Burlington, for Defendants-Appellees.

¶ 1. **Skoglund, J.** This case arises from a dispute over obligations under a lease between landlord, Century Partners, and tenant, Lesser Goldsmith Enterprises. Landlord brought an eviction action against tenant, alleging that tenant defaulted on the lease by constructing improvements to its store without the necessary municipal permit. Tenant counterclaimed for lost profits it suffered due to a four-year delay in expanding the store into an additional space rented from landlord. The superior court concluded that tenant did not breach the lease because landlord failed to cooperate with tenant in good faith to obtain the proper permits. The court further held that landlord breached the rental contract by withholding consent for tenant to renovate its expanded space. Landlord appeals, claiming that the court erroneously: (1) held that landlord had an implied duty to assist tenant in obtaining the necessary permits; (2) awarded tenant damages for landlord's decision to withhold consent to renovate; and (3) declined to grant landlord damages and eviction. We affirm.

¶ 2. The record reveals the following facts. In August 1997, landlord and tenant signed a ten-year lease for 5280 feet of retail space in a newly constructed five-building Planned Unit Development (PUD) in the City of South Burlington. Tenant, through its principal Katy Lesser, operates a natural food store called Healthy Living. Katy Lesser signed a personal guarantee as an amendment to the lease. The lease contained the following clause:

> Lessee shall, at Lessee's sole cost and expense, comply with all of the requirements of all county, municipal, state, federal and other applicable governmental authorities, now in force, or which may hereafter be in force, pertaining to the Premises, and shall faithfully observe in the use of the Premises all municipal and county ordinances and state and federal statutes now in force or which may hereafter be in force, and all regulations, orders and other requirements issued or made pursuant to any such ordinances and statutes.

¶ 3. Using landlord's contractor, tenant renovated the space for its food store, including building a 500-square-foot mezzanine to provide extra storage and office space. Landlord reviewed tenant's "fit-up" plans, including the construction of the mezzanine. At the time, neither tenant nor landlord knew that this mezzanine placed the building beyond the 15,000 square feet designated in the building's certificate of occupancy (CO). The new store opened in 1998.

¶ 4. Tenant's business prospered in the space and it sought to expand the store. In April 1999, the parties signed a lease amendment for tenant to let an additional 2592 square feet of adjoining space in the PUD. Tenant wanted to fit-up the new space as it had the original store. Tenant's plan included extending the mezzanine into the newly leased space and removing the wall between the original store and the new space. To further this goal, tenant submitted an application for design review to the development review board that included a requested amendment of the PUD to permit the construction of the new mezzanine space and the fit-up of the new space. At this time, landlord was supportive of tenant's efforts. In December 1999, the board met and approved tenant's application to construct the new mezzanine, complete the proposed fit-up, and include the existing mezzanine in the PUD, thus potentially resolving any dispute over the

space's compliance with requirements regarding the total square footage of the building. Tenant then applied for a zoning permit so it could begin construction. The city issued a zoning-building permit in March 2000 that authorized construction of the new mezzanine.[1]

¶ 5. Later in 2000, the permit was revoked by stipulation between the city and landlord because of an impasse between the city and landlord over concerns with the entire PUD. As a result, tenant did not undertake any construction on the new premises.

¶ 6. Thereafter, in September 2000, the city sent letters to landlord and tenant listing nine alleged zoning violations of the PUD, three of which concerned the tenant's occupied space. Those concerning tenant included exposed items in the rear of the building, an inadequate floodlight, and a mezzanine that expanded the floor space beyond that allowed under the CO. The letter directed both landlord and tenant to cure the violation by obtaining "a zoning permit for the unauthorized improvements." The letter also threatened legal action and fines if the violations were not cured. This letter noticed both tenant and landlord that, according to the city, the 500 square feet of mezzanine space in tenant's original store put the building's total square footage beyond the CO's permitted space of 15,000 square feet. Landlord challenged the violations and filed an appeal with the development review board. Following the board's unfavorable decision, landlord pursued the case through the Environmental Court, superior court and, eventually, in this Court. See *In re Tekram Partners*, 2005 VT 92, ¶ 2, 178 Vt. 628, 883 A.2d 1160 (mem.) (reciting the procedural history of the litigation).

¶ 7. From the beginning, landlord took the position that it was tenant's responsibility to be in compliance with city ordinances and to cure the zoning violations. In November 2000, landlord sent tenant a letter insisting that tenant immediately cure the violations, including the violation for using and occupying mezzanine space without a proper CO. In the spring of 2001, tenant cured two of the cited violations applicable to its space by replacing an exterior light fixture and reducing the storage of unscreened materials outside the store.

---

[1] Tenant signed this permit "Katy Lesser (for Peter Judge)." Peter Judge is landlord's principal. At the time, the city allowed commercial tenants to apply for a zoning permit. The city has since changed its practice and now requires the property owner to sign and submit an application.

¶ 8. In May 2001, tenant forwarded to landlord, for its review and signature, building plans and a zoning-permit application to amend the PUD permit to get a CO reflecting the building's actual square footage. Tenant required landlord's approval to commence with the fit-up because, under the terms of the lease, tenant needed landlord's permission to make improvements that exceeded $5000.[2] Landlord refused to sign the application or to consent to the plans. Tenant continued its attempts to obtain landlord's approval for construction of the new space and to amend the PUD permit, but landlord refused to meet or discuss the plans. In June 2001, tenant again sent landlord a letter, explaining its intent to abandon the idea of constructing a new mezzanine and seeking to communicate about the issue. Tenant explained, however, that without the expanded mezzanine it was "severely limit[ed]" by what it could do in the new space. In July 2001, landlord wrote to tenant reiterating that tenant was in default under the lease for failure to cure the zoning violations, and invited any "concrete proposals to resolve the situation." In response, in February 2002, tenant sent landlord another letter detailing its plans to fit-up the new space without the expanded mezzanine and inviting landlord to review its proposal.

¶ 9. While tenant was working to obtain landlord's permission to fit-up the new space, landlord was seeking reimbursement from tenant for legal fees expended in connection with landlord's legal fight with the city over the zoning violations. In a letter of March 6, 2002, landlord attributed most of the litigation expenses to actions taken by tenant and stated, "it is our intention to seek reimbursement, under the terms of our Lease Agreement, from [tenant]." Tenant responded, denying responsibility for the legal fees. In a letter of March 22, 2002, tenant explained that it wanted to cure the CO but could not apply for an amended permit because it did not own the property, as the city required at that time. Tenant expressed a desire to solve the problem without litigation.

¶ 10. In May 2003, landlord sent tenant a demand for $10,495.95 for half of the legal expenses incurred in connection with its appeal of the zoning violations to the Environmental Court. See

[2] The city also requires a permit for improvements over $5000. The city administrator testified that only work involving structural alterations triggers the permit requirement.

*In re Tekram Partners*, 2005 VT 92, ¶ 2 (reviewing the procedural history of the litigation). Tenant did not pay for the legal fees. On June 20, 2003, landlord sent tenant a formal notice of default for failing to obtain proper permits.

¶ 11. Meanwhile, tenant continued to attempt to communicate with landlord about its proposals for the new space, but after failing to receive landlord's approval, tenant decided to go ahead without landlord's consent. Tenant worked with the city to create a design that would not trigger the city's permit requirement — in other words, a design in which no structural alteration would exceed $5000. Following the city's approval of its plan, in August 2004, tenant proceeded with the proposed fit-up of the expanded space. While the lease between tenant and landlord required landlord's approval for any improvements costing more than $5000, tenant went forward without landlord's consent. Landlord immediately demanded that tenant cease working on the space, and characterized the work as a breach of the lease. Tenant proceeded with the work, stopping for only a few months to obtain a permit from the Department of Labor and Industry.

¶ 12. Landlord filed for eviction on September 22, 2004, claiming that tenant breached the lease by failing to obtain a proper CO and by renovating the 1999 space without landlord's approval. Tenant counterclaimed for profits it lost during the time that landlord's inaction prevented tenant from using the 1999 space.

¶ 13. In May 2006, a three-day bench trial was held. The court found that tenant had not breached the lease because landlord's own acts caused any failure of tenant to comply with the terms of the contract. Specifically, the court held that landlord did not cooperate with tenant in good faith to obtain a proper CO. In addition, the court concluded that the lease did not obligate tenant to reimburse landlord for its attorney's fees because landlord independently chose to pursue extended legal action. Finally, the court found that landlord unreasonably withheld its consent for tenant to renovate the 1999 space. As to damages, the court concluded that tenant could not recover for lost profits because it was a new business and computation of lost profits was too uncertain, but awarded tenant the rent it paid for the 1999 space since it could not fully utilize it. In August 2006, a hearing was held on the issue of damages, specifically whether tenant obtained any offset for monetary benefit from the new space during the relevant period. Ultimately, the court awarded tenant rental

payments from June 2001 to September 2004, less a small amount of profit that tenant realized from using the space for storage and for the sale of goods during that time. Landlord appealed.

I.

¶ 14. Landlord contends that tenant breached the lease by failing to obtain a proper CO, and that the trial court's ruling otherwise was erroneous. The trial court concluded that tenant's failure to obtain a CO for a square footage including the mezzanine was not a breach because landlord prevented tenant from correcting the violation by refusing to sign an application for an amended permit. The court explained that landlord "has refused for more than 5 years to sign the application for an amended permit and has stated that he will only do so if [tenant] pays $10,495 towards [landlord's] legal fees." The court concluded that landlord could not evict tenant for failing to obtain a permit when "[landlord] has intentionally prevented the tenant from obtaining the permit." We review de novo the trial court's construction of the lease's terms. *Downtown Barre Dev. v. C & S Wholesale Grocers, Inc.*, 2004 VT 47, ¶ 8, 177 Vt. 70, 857 A.2d 263. The trial court's factual findings will be affirmed, unless clearly erroneous. *Clayton v. Clayton Invs., Inc.*, 2007 VT 38A, ¶ 9, 182 Vt. 541, 929 A.2d 713 (mem.).

¶ 15. Landlord challenges the court's decision on several grounds. First, landlord argues that the evidence compelled the trial court to find that tenant had the ability to cure the permit violation without landlord's assistance by removing the mezzanine. We reject this reasoning because it was not argued below[3] and because the trial court's findings to the contrary are supported by the evidence presented at trial.

¶ 16. At trial, landlord argued that tenant could cure the violation by obtaining a proper CO or by ceasing to use the mezzanine. Landlord's theory was that tenant "chose to occupy"

---

[3] Although landlord cites several places in the record where it purportedly raised this issue, we disagree that the argument was raised below. At best, the testimony landlord cites demonstrates that landlord suggested that one option tenant had to cure the default was for tenant to cease using the mezzanine. Landlord agreed that this was a "ludicrous" solution. At one point, landlord testified that it would take down the mezzanine after it evicted tenant, but landlord did not argue or introduce evidence that the simplest solution to the problem was for tenant to remove the mezzanine.

the mezzanine and to incur the violation. The city administrator testified, however, that not using the mezzanine would not cure the violation because the nonpermitted space would still exist. The administrator explained that the mezzanine would have to be removed to cure the violation. Now, on appeal, landlord contends that the trial court failed to make an essential finding that tenant "could have cured the zoning violation by simply removing the small mezzanine." As noted, landlord did not present this theory during the three days of testimony to the trial court. Nor did landlord include such a finding in its proposed findings to the court. The first time that landlord suggested this proposed finding was in a supplemental brief after the trial ended. Because landlord failed to present this theory to the trial court or to offer sufficient proof to support it below, we decline to address landlord's argument on appeal. See *Roberts v. Chimileski*, 2003 VT 10, ¶ 14, 175 Vt. 480, 820 A.2d 995 (mem.) (declining to address a theory first presented to the trial court after the evidence closed).

¶ 17. The evidence presented at trial established that tenant tried to solve the problem with the CO, but was prevented from doing so. The city administrator testified that the "simplest" solution to cure the mezzanine problem was to submit an application for a new CO that properly reflected the actual square footage. The administrator explained that these applications were routinely granted. Further, the court found that tenant offered to submit a permit to the city, but landlord would not sign it.

¶ 18. Nonetheless, landlord insists that it had no duty to cooperate with tenant to obtain the permit because the lease placed the obligation to comply with municipal ordinances solely on tenant. Landlord argues that the court placed a burden on landlord not originally included in the contract. In support, landlord cites *Sessions, Inc. v. Morton*, 491 F.2d 854 (9th Cir. 1974), a case in which a corporation leased land from members of the Agua Caliente Band of the Mission Tribe, held in trust by the Bureau of Indian Affairs (BIA). Under the terms of the lease, the corporation was required to develop and improve the land. The BIA cancelled the lease after the corporation defaulted on its obligation. The corporation brought suit seeking review of the agency action. The corporation conceded that it did not complete construction by the required date, but claimed that its default should be excused because the BIA did not fulfill its contractual duty to either approve or disapprove its proposed plan, a part of

which required the tribal members to dedicate part of their land to the city. On appeal, the court held that "there is an implied covenant in every contract that each party will do nothing to deprive the other of the benefits arising from the contract," but explained that any obligation of good faith must arise out of the contract's language. *Id.* at 857. The court concluded that because the lease contained no mention of land dedication, the proposed plan contained a substantial amendment to the lease, and the BIA was not required to approve or disapprove the plan. *Id.*

¶ 19. Landlord contends that the construction of the mezzanine and the amendment of landlord's PUD were not terms of the lease, and therefore, as in *Sessions*, landlord did not have an obligation to cooperate with tenant as to these matters. The trial court held that landlord's refusal to cooperate with an application for an amended PUD forced tenant into a continued breach of the lease and that landlord's refusal to assist tenant with the fit-up of its additional space in 1999 — despite the fact that landlord had no objection to the fit-up itself — was a violation of the covenant of good faith and fair dealing. Neither holding adds terms to the contract or places obligations on landlord outside of those already imposed by its lease with tenant.

¶ 20. The issue is not whether the lease required landlord to provide tenant with a mezzanine or whether the lease specifically obligated landlord to cooperate with tenant in obtaining permits. The issue is whether tenant was entitled to landlord's good-faith cooperation in attempting to cure the permit violation caused by the mezzanine and to acquire the necessary permits to refit the new space. And, while tenant had the obligation under the lease to comply with all federal, state and local permit requirements, most of those permits, including the application for an amended permit necessary for a proper CO, required the landowner's signature or approval. Therefore, it was impliedly contemplated that landlord's signature would not be unreasonably withheld.

¶ 21. The trial court did not, as claimed, use the duty of good faith to impose new obligations not already included in the contract. See *Downtown Barre Dev.*, 2004 VT 47, ¶ 18 (concluding that the implied covenant of good faith and fair dealing cannot impose additional affirmative obligations not originally included in the contract). The covenant of good faith and fair dealing is implied in every contract and ensures that parties "act with

'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.' " *Carmichael v. Adirondack Bottled Gas Corp. of Vt.*, 161 Vt. 200, 208, 635 A.2d 1211, 1216 (1993) (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)). The purpose of the implied covenant of good faith and fair dealing is to ensure that each party will not do anything " 'to undermine or destroy the other's rights to receive the benefits of the agreement.' " *Southface Condo. Owners Ass'n v. Southface Condo. Ass'n*, 169 Vt. 243, 246, 733 A.2d 55, 58 (1999) (quoting *Carmichael*, 161 Vt. at 208, 635 A.2d at 1216); see *Metro. Ventures, LLC v. GEA Assocs.*, 2006 WI 71, ¶ 36, 717 N.W.2d 58 ("The duty of good faith arises because parties to a contract, once executed, have entered into a *cooperative relationship* and have abandoned the wariness that accompanied their contract negotiations, adopting some measure of trust of the other party."). Here, tenant could not apply for a permit amendment to cure the CO discrepancy without landlord's approval. Landlord created the continuing violation and failed to cooperate with tenant and thus undermined tenant's rights under the lease.

■ ¶ 22. Finally, landlord contends that it did not decline to submit the application in bad faith, but that it had legitimate business reasons to avoid applying for an amendment to its PUD. According to landlord, those legitimate business reasons included: (1) a good-faith belief that the mezzanine was covered by an existing CO, and (2) a desire to avoid opening up the entire PUD for review by submitting a permit amendment, for fear that the city's approval would be contingent on additional unrelated conditions. The evidence does not support landlord's argument. The court specifically found that landlord refused to submit the permit because tenant would not pay for half of landlord's legal fees and not for any other potentially legitimate business reason. This finding is supported by the evidence. Landlord's principal testified several times that he would not sign a zoning-permit application unless tenant agreed to reimburse him for attorney's fees. On one occasion during cross-examination, landlord's principal was asked if tenant's principal had done everything in her power to cure the violations. Landlord replied, "No, she didn't do everything. . . . She could've paid for part of our expenses to correct the problem and then we would've been happy to go forward."

¶ 23. Furthermore, landlord's contention that it failed to apply for an amendment to its PUD out of fear that the city would

226

impose upon it additional and unconnected requirements is speculative and not supported by the evidence. At trial, landlord's principal disclosed that it had obtained an amendment to the PUD several months before trial, but forgot to include in the application a request to increase the square footage for tenant's building. Furthermore, landlord's principal testified that, in addition to his fears of the application process, he wanted reimbursement of attorney's fees incurred from landlord's legal battle with the city.

▮ ¶ 24. Our holding is consistent with the cases landlord cites in support of its argument. In *Herbert v. 52 Enterprises*, the tenant was operating a commercial enterprise in a building space zoned for residential purposes only and the court held that the landlord did not have an obligation to cooperate with the tenant to obtain a proper CO because the zoning violations were "substantial . . . involving public safety." 197 N.Y.S.2d 617, 620 (Sup. Ct. 1960). The court explained that "the cost of making the necessary repairs, alterations and renovations for the occupancy of only one tenant would be exorbitant, uneconomic, and an inequitable burden to place on [the landlord]." *Id.* (emphasis omitted). However, the *Herbert* court also wrote: "[u]ndoubtedly, where a tenant seeks to correct a mere technical violation of a [CO], a landlord should, in good faith, cooperate with such tenant or be barred from causing a forfeiture of the tenancy and the removal of the tenant because of such alleged violation." *Id.* Here, the CO violation was technical in nature, and thus landlord had a duty to cooperate "in good faith" to attempt to cure it.

II.

¶ 25. Next, landlord complains that the court erred in concluding that it breached the lease by withholding its consent for tenant's fit-up of the 1999 space, and in awarding damages to tenant for this breach. The lease required tenant to obtain prior written approval from landlord for "any alterations, additions, improvements, or changes" exceeding $5000. Landlord contends first that it had a contractual right to arbitrarily deny consent for tenant to alter the premises, and second that it could forbid alterations because tenant was already in default. We reject landlord's second argument because, for the reasons already described, we agree with the trial court that tenant did not breach the terms of the lease. As to the first argument — that landlord

could withhold consent for alterations for any reason — we affirm the trial court's decision that landlord's withholding of consent deprived tenant of the benefit of its bargain in leasing the 1999 space.

¶ 26. The trial court correctly held that landlord's ability to withhold consent was "subject to the implied covenant of good faith and fair dealing, present in every contract." The covenant of good faith and fair dealing is an implied promise that protects the parties to a contract from bad-faith conduct. *Carmichael*, 161 Vt. at 208-09, 635 A.2d at 1216-17. There is no specific definition of bad faith because it depends on the factual circumstances, but some examples include " 'evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.' " *Id.* at 209, 635 A.2d at 1217 (quoting Restatement (Second) of Contracts § 205 cmt. d). Good faith is a question of fact.

¶ 27. In this case, the court found that landlord continually rebuffed tenant's attempts to meet and discuss plans to renovate the 1999 space, even though landlord knew that tenant leased the space for the sole purpose of using it to expand the grocery store. Due to landlord's refusal to discuss tenant's proposed fit-up, the space was, as the trial court found, "essentially unusable except in a very limited way from 1999 until the completion of fit-up work late in 2004." The court found that landlord's refusal "was unreasonable and motivated only by a desire to pressure [tenant] into paying a portion of [its] legal fees in the unrelated zoning case." The evidence supports the court's finding that landlord did not exercise good faith in withholding consent to renovate the space, and thus breached its obligation of good faith and fair dealing.

¶ 28. Landlord also argues that even if it breached the lease, damages are unrecoverable because tenant failed to mitigate. The nonbreaching party has a duty to make reasonable efforts to mitigate damages because "an injured party should not be able to recover damages for loss that could have been avoided with reasonable effort." *O'Brien v. Black*, 162 Vt. 448, 452, 648 A.2d 1374, 1376 (1994). In this case, the trial court concluded that tenant took reasonable measures to reduce the loss incurred as a result of the delay in renovating the 1999 space. This conclusion

was based on its findings that: (1) tenant tried repeatedly to communicate with landlord about its renovation plans; (2) tenant revised its plans several times in an attempt to please landlord; (3) tenant attempted to use the space; and (4) tenant undertook a modified renovation, despite landlord's objections. All of these findings are supported by credible evidence.

¶ 29. Landlord contends that tenant could have completed the alterations it eventually undertook at any time, and that therefore the space was not unusable. Landlord compares the situation to the one we addressed in *O'Brien*, where we denied a commercial landlord damages for rent of vacant commercial retail space after the tenant left. In *O'Brien*, the landlord could have let the space more promptly, but made a business decision to wait and pursue a tenant from a national chain. We held that the landlord could not "impose the cost of its decision on the breaching tenant." *Id.* at 455, 648 A.2d at 1378. According to landlord, tenant similarly made a business decision to delay renovating and using the 1999 space, and if tenant had made improvements earlier tenant "could easily have avoided any financial loss flowing from its delay in remodeling."

¶ 30. The evidence does not support landlord's assertion that tenant delayed the fit-up based on its own internal business decision. There was no reasonable business reason for tenant to delay using the new space for which it was paying rent; in fact, tenant repeatedly expressed its desire to use the space, but was limited by landlord's refusal to consent to any renovation of the space. The evidence supports the trial court's finding that tenant attempted to use the space as much as possible and that landlord impeded full use of the space by refusing to sign a permit, to grant tenant permission to complete renovations, or even to discuss possible acceptable options with tenant. Landlord's argument that tenant could have undertaken the 2004 improvements in 1999 totally ignores the context of the situation. The trial court's findings that tenant exercised good faith and made a reasonable effort to mitigate damages is supported by credible evidence and is affirmed. See *id.* at 454, 648 A.2d at 1377 (reviewing factual findings for clear error and affirming where findings supported by credible evidence).

## III.

¶ 31. Finally, we address landlord's claims for eviction and damages. Under the lease, if tenant holds over, landlord is entitled to liquidated damages of 120% of the rent. Because we affirm the trial court's conclusion that tenant did not breach the lease, we also affirm the court's denial of landlord's request for eviction and for liquidated damages.

¶ 32. Landlord also contends that it is entitled to reimbursement from tenant for legal expenses incurred in its attempt to cure the zoning violations. We conclude that there is no basis for reimbursement. In support of its request for fees, landlord cites a provision in the lease requiring tenant to indemnify landlord for "any and all claims, damages, liabilities or expenses arising out of . . . any and all claims arising from any breach or default in the performance of any obligation of [tenant]." Even if we were to agree that this provision includes reimbursement of attorney's fees, landlord cannot claim any benefit under it because tenant did not breach its obligations under the lease. Moreover, as the trial court found, landlord unilaterally chose to engage in litigation to address the zoning violations which tenant had no ability to cure. As the trial court explained, landlord "entered into this legal battle for [its] own reasons and without any commitment from [tenant] to help [it]." The evidence supports the court's findings. Thus, we agree that tenant was not required to help finance landlord's independent choice to pursue protracted and expensive litigation.

*Affirmed.*